Anne ANDERSON, et al., Plaintiffs,

v.

BEATRICE FOODS CO., Defendant.

Civ. A. No. 82–1672–S.

United States District Court,
D. Massachusetts.

Dec. 12, 1989.

Jan Richard Schlichtmann, Schlichtmann, Conway & Crowley, Boston, Mass., Anthony Z. Roisman, Washington, D.C., for plaintiffs.

Jerome P. Facher, Neil Jacobs, Hale & Dorr, Boston, Mass., for Beatrice Foods and John J. Riley Co.

James Brown, Foley, Hoag & Eliot, Jerry O'Sullivan, Choate, Hall & Stewart, Paul Galvani, Ropes & Gray, Boston, Mass., for W.R. Grace.

## FINAL REPORT TO THE COURT OF APPEALS FOLLOWING REMAND

SKINNER, District Judge.

### SUMMARY OF PRIOR PROCEEDINGS

In this action plaintiffs claim that they and deceased family members of some of them were poisoned through the negligence of the defendant in causing toxic waste to infiltrate the municipal water supply of the City of Woburn, where the plaintiffs reside. Plaintiffs asserted two theories of liability: (1) defendant negligently permitted others to dump toxic wastes on a parcel of wetland which it owned adjoining the Aberjona River, referred to in prior proceedings as "the 15 acres"; and (2) defendant either dumped toxic wastes from its tannery operation onto the 15 acres or negligently permitted toxic wastes dumped at the tannery site to migrate into the Aberjona Valley aquifer. Municipal wells G and H, which allegedly supplied water to the plaintiffs' households were located across the Aberjona River opposite part of the 15 acres and upstream from the tannery. The relevant polluting chemicals were agreed to be a group of chlorinated hydrocarbons, principally trichloroethylene (TCE) and tetrachloroethylene (PERC), generally referred to in prior proceedings as the "complaint chemicals."[1] The trial of the case was trifurcated. The first stage dealt with the presence on the defendant's properties of the complaint chemicals, the defendant's due care or lack of it, foreseeability of harm to the plaintiffs and migration of the complaint chemicals into the aquifer and thence to wells G and H. After massive and frenetic discovery, the first stage of the trial proceeded before a jury for 78 trial days. During the course of the trial, I directed a verdict on the second branch of plaintiffs' claim ("the tannery case"). The first branch of their claim ("the 15 acres case") was submitted to the jury on special interrogatories. The jury's answer to the first interrogatory required the entry of judgment for the defendant. In response to plaintiffs' post-verdict objection to the ambiguous form of the interrogatories, I made a finding of fact under Fed.R.Civ.P. 49(a): plaintiffs had not proven by a preponderance of the evidence that the complaint chemicals migrated to wells G and H.

After the entry of judgment for the defendant (which was inexplicably delayed for many months), the plaintiffs fortuitously discovered the existence of two reports of environmental studies of the tannery site which had been made in 1983 and 1985, prior to the trial. (Following the lead of the court of appeals, which found that the second report was a relatively insignificant variant on the first, I shall refer to both reports collectively as "the Report.") Claiming that the Report was a significant document that should have been furnished in response to various discovery requests,

---

1. These are commonly used industrial and household cleaning agents.

plaintiffs moved to set aside the judgment under Fed.R.Civ.P. 60(b)(3). In my order of January 22, 1988, 127 F.R.D. 1, appendix at p. 6, I ruled that the Report should have been furnished in response to discovery but that this default did not prevent the plaintiffs from fully and fairly presenting their case. Accordingly I denied the plaintiffs' motion.

The plaintiffs appealed the denial of the Rule 60(b) motion to the court of appeals, wherein an appeal from the defendant's judgment was already pending. The two appeals were consolidated and determined by the court's opinion dated December 7, 1988. *Anderson v. Cryovac*, 862 F.2d 910 (1st Cir.1988). After a comprehensive exegesis, the court affirmed the trial rulings and findings. It retained jurisdiction of the plaintiffs' Rule 60(b) motion but remanded the case to me for further specifically delineated proceedings as follows:

1. Conduct of an evidentiary hearing and determination whether the defendant, acting alone or in concert with the Riley interests, knowingly or intentionally concealed the Report.

2. Decision, after "an orderly presentation from all parties," "whether lack of access to the Report substantially interfered with plaintiffs' efforts to prepare and present a case as to the nexus between the tannery and the pollution of wells G and H." Plaintiffs would be entitled to a presumption of substantial interference if the defendant's conduct had been found to be knowing, deliberate or intentional.

3. Formulation of recommendations to the court of appeals as to what remedy, if any, to which the plaintiffs are entitled. (I assume from the court's preceding discussion that these recommendations should specifically address the plaintiffs' demand for a new trial, or at least for the opportunity for further discovery.)

4. Recommendation "as to the appropriateness *vel non* of sanctions anent any unexcused discovery violations."

Pursuant to the mandate from the court of appeals, I held hearings during the first three months of 1989 on the subject of the defendant's misconduct. On July 7, 1989, I made a finding that John J. Riley and his attorney had engaged in "deliberate misconduct" which was attributable to the defendant, thus entitling the plaintiffs to a presumption that the nondisclosure of the Report substantially impaired their preparation for trial. 127 F.R.D. 1 (1989). This finding was submitted to the court of appeals.

I thereafter determined that resolution of the question of substantial interference would be facilitated by the testing of the tannery site for the presence of the complaint chemicals by an independent expert appointed by the court under Federal Rule of Evidence 603, to be paid for by the defendant as a partial sanction for its misconduct. After first agreeing to this procedure, the plaintiffs withdrew their agreement, refused to participate in the process for the selection of the independent expert and continuously objected to this plan. I nevertheless went forward with the appointment of the independent expert until it appeared that alterations in the topography of the tannery site since the time of the trial would require the drilling of new test wells, which would have taken many months longer and cost much more than had been originally suggested. On September 1, 1989, I then cancelled the whole program by an order from the bench. My orders dated July 14, July 25 and September 8, 1989, which delineate the course of these events, are attached hereto as Appendices A, B, and C.

Thereafter both parties sought discovery. Most of their requests were denied, on the theory that sufficient discovery had taken place to permit both parties to fully try the next stage of the case. The plaintiffs sought an order compelling the defendant to search a warehouse full of miscellaneous business records of the tannery. In my view, as a result of the January–March, 1989, hearings, plaintiffs had already obtained all of the documents likely to bear on use and disposal of the complaint chemicals, namely the tannery laboratory records and Mr. Riley's personal file

of formulae. The defendant sought to depose plaintiffs' counsel and to obtain counsel's investigative files. As requested this discovery would have been too great an invasion of the attorney's work product and confidential information even for this extraordinary situation. In my view, however, it is undeniable that an understanding of the state of plaintiffs' trial preparation would be material to a determination of whether plaintiffs' trial preparation had been substantially impaired. Since the defendant had the burden of rebutting the presumption in the plaintiffs' favor it was entitled to some form of limited discovery, even though in the ordinary posture of litigation even a limited invasion of an attorney's files would be improper. Plaintiffs correctly argued that revelation of their investigative methods and the names of persons who had been interviewed would seriously prejudice them if in fact a new trial were to be ordered. Accordingly I ordered the plaintiffs' counsel to furnish his investigative file to me *in camera* with the understanding that I would use it to the extent that I deemed it material but would not show the documents to the defendant. Plaintiffs' counsel complied with this order over protest, and I have in fact used the material in his notebook in arriving at my decision, as shall hereinafter appear.

Mr. Riley and Ms. Ryan then moved for reconsideration of my findings of July 7, 1989. Those motions were denied from the bench, and my subsequent memorandum on the subject appears as Appendix D hereto.

FINDINGS AND RECOMMENDATIONS RE SUBSTANTIAL INTERFERENCE WITH PLAINTIFFS' TRIAL PREPARATION

1. *The Tannery Case*

On October 16, 1989, I commenced seven days of hearings on the issue of substantial interference with the plaintiffs' trial preparation. Plaintiffs had the benefit of a presumption that the failure to produce the Report constituted substantial interference. To rebut this presumption the defendant offered various documents, many of which were already part of the record, tending to show (a) that the information contained in the Report relative to ground water flow was available from other sources and (b) that the evidence in the defendant's possession clearly indicated that there was no disposal of the complaint chemicals at the tannery site. Counsel pointed out that plaintiffs had not monitored Riley production well no. 1 during the pump test of wells G and H and asked me to infer from that fact that plaintiffs would not have been sufficiently interested in the tannery site to monitor the test wells revealed in the Report even if they had known about them. The defendant also introduced evidence of soil testing of the tannery site in July and August of 1986 which revealed none of the complaint chemicals. There were sufficient indications of changes on the site, however, to cast doubt on the probative value of these reports, and I have not relied upon them in arriving at my conclusions, except as minimally corroborative of other evidence. I did rely on the plaintiffs' investigative notebook referred to above and treated it as evidence submitted by the defendant even though defendant's lawyer was not permitted to inspect it. Its contents were, of course, well known to plaintiffs' counsel. In my opinion, these materials rebutted the presumption in favor of the plaintiffs by clear and convincing evidence, for reasons which I will explain in detail later on in this report.

At that point I had not reviewed the defendant's evidence and accordingly reserved judgment on plaintiffs' motion for a finding of substantial interference on the basis of the presumption in their favor. Since in the event that defendant's evidence proved sufficient to rebut the presumption the plaintiffs still had the ultimate burden of proving substantial interference, the plaintiffs offered the testimony of Professor Sykes, an expert hydrogeologist, Mr. Raboin, a technical specialist in polymer sciences at the University of Massachusetts, and Dr. De Cheke, an analytical chemist and pharmacist. I admitted the testimony of Professor Sykes but

excluded the testimony of Raboin and De Cheke. I permitted the plaintiffs to make an extended offer of proof of their proffered testimony concerning trial exhibit WBARZ' ("Ex. Z' "). The original history and subsequent consideration of Ex. Z' require extended separate discussion, and I shall explain my exclusion of the testimony when I reach that point in this memorandum.

### (a) *The hydrogeological significance of the Report*

Dr. Sykes' testimony would warrant a finding that the Report, together with the other hydrogeological information available to the plaintiffs, would have enabled the plaintiffs' expert to draw the following conclusions:

1. The geological barrier between the Aberjona Valley aquifer and the upland at the tannery site was some distance west of the railroad tracks, further west than indicated on plans prepared by defendant's experts.

2. There is a subsidiary aquifer carrying ground water underneath the tannery site and flowing in an easterly direction toward the river more or less following the course of a swale which is visible on the surface. Because the subsurface gradients at this point are relatively steep, the velocity of the easterly flow is comparatively great, sufficient to carry ground water pollutants at the tannery site into the main stream of the Aberjona Valley aquifer.

3. Under ordinary conditions any such flow of pollutants would have been carried southward by the natural course of the aquifer. This flow extended far enough to the east, however, so that pollutants would have been within the cone of influence of wells G and H when they were pumping and thus drawn into the City of Woburn's water supply.

In my opinion this testimony, if believed, coupled with the opportunity to monitor existing test wells at the tannery site during the December, 1985 pump test, would have been important to the preparation of a "tannery case." It is no answer to say that the plaintiffs' hydrogeologist should

have figured all of this out on his own. It follows that failure to produce the Report would have substantially impaired the plaintiffs' presentation of a "tannery case" if, in fact, there had been any "tannery case" which this information could legitimately have supported.

### (b) Investigation, discovery and trial of the "tannery case"

In argument before me on October 17, 1989, plaintiffs' counsel provided a key to the understanding of the so-called "tannery case":

> Mr. Facher said today that our position was we had unauthorized disposal at the 15 acres and we were trying like hell to get the tannery involved in that disposal operation because Mr. Facher, Hale & Dorr, and Beatrice, knew as the plaintiffs knew that a case of unauthorized dumping, third party dumping, dumping by strangers at unknown times, that is a much harder case than a case which involves direct disposal, direct knowledge of the property owner itself, and in this case the tannery. It is much better to have a Grace case where the employees dump their own stuff than it is to have a case which someone came at some time and dumped, and did the property owner know about it.

> \* \* \* \* \* \*

> My discovery was my attempts to find out what did I have as evidence to make my case. The sum total of what I had at the end of all the discovery and all the bellyaching and relaxation therapy, the end of the process that cost millions of dollars, thousands of hours, and scores of people, was I put on the best case I thought I had, which was an unauthorized disposal case, and the only connection that I felt I could credibly present to a jury which I had facts about was the tannery dumping on the side of the hill, the stuff coming down, the stuff at the 15 acres Mr. Dobrinski [the plaintiffs' geologist] said was tannery waste [Ex. Z'], that was the only link.

Counsel's statement accurately reflects plaintiffs' strategy and the state of their case with respect to disposal of the com-

plaint chemicals at the tannery site. Prior to trial, private investigators engaged by the plaintiffs interviewed scores of people, including many employees and former employees of the tannery, suppliers of chemicals to the tannery and residents and former residents of the Salem Street area in the vicinity of the tannery.

On February 14, 1986, as the trial was beginning, plaintiffs' principal investigator reported,

Our inquiries to chemical suppliers and toxic waste haulers that have done business with Riley did not uncover evidence that the tannery had been using chlorinated solvents [i.e., complaint chemicals] in addition to those already acknowledged by John J. Riley, Jr.

The use of complaint chemicals acknowledged by Riley consisted of

(1) the use of a fuel additive called 7D–24 containing 2% PERC, which was totally consumed by combustion; and

(2) the use of a mixture of silicone and PERC used to waterproof leather for army boots in the late 1960's which was recycled in the spraying device until it was used up, leaving no waste to be disposed of.

The investigator's summary accurately reflected a thorough and well-documented inquiry. In fact, in April of 1985 one supplier of industrial chemicals told the investigator that the complaint chemicals "do not belong in the leather industry."

All of the many employees and former employees of the tannery interviewed by plaintiffs' investigators stated that they knew of no use of the complaint chemicals, and the former chemical processor for the tannery said that TCE and toluene were not used. The investigator reported that one former employee said that he believed that TCE was used for cleaning, but when that employee was deposed by the plaintiffs on October 11, 1985, he testified that TCE was not used at the plant.

Many residents and former residents of the Salem Street area were interviewed. They all said that they had observed considerable use of the access road to the 15 acres by third parties and the dumping of

the contents of old barrels by the Whitney Barrel Company, but they had never seen any dumping of material from the tannery on the 15 acres or use of the access road by tannery personnel.

Notwithstanding the fact that his own investigative file contained no support whatsoever for the claim of disposal of the complaint chemicals at the tannery site, or by the tannery on the 15 acres, and significant positive evidence to the contrary, plaintiffs' counsel pressed his claim of tannery dumping at trial. He was permitted to introduce evidence of the overflow of a grayish-white material from the tannery's sedimentation pond running down the hillside to the 15 acres, and of various instances of overflow from the tannery's connections to the municipal sewer system. There was no evidence that any of this material contained any of the complaint chemicals. This evidence was admitted on the basis of counsel's representation that it would be tied into evidence of the disposal of complaint chemicals. This tie-in never materialized. Various employees of the tannery were called as witnesses, including Mr. Kaine, the production manager, and were examined exhaustively concerning the use of PERC in waterproofing boot leather, the process referred to in the investigator's report. They all testified that all of the coating material was absorbed in the leather, and that there was no disposal of complaint chemicals at the tannery site. This testimony was never contradicted or impeached in the course of the trial.

Plaintiffs' main evidence was the testimony of Dobrinski, the plaintiffs' geologist, that he had found a reddish-brown "peat-like" substance on the 15 acres near test well # 3. This material was tested on behalf of both parties and found to be substantially saturated with several complaint chemicals. It was admitted in evidence as plaintiffs' Ex. Z'. Dobrinski stated that in his opinion the substance was tannery waste, specifically sludge which had escaped from the sedimentation tank next to the tannery. In my opinion this testimony had insufficient probative value, standing unsupported as it did, to warrant the sub-

mission to the jury of the plaintiffs' claim of tannery dumping, for the following reasons:

(1) Dobrinski is a geologist with no training or experience in leather manufacture, whose opinion was completely lacking in foundation.

(2) Ex. Z' did not bear any resemblance to the tannery sludge introduced in evidence. Tannery sludge is dark gray in color, coarse and gritty in texture and smells strongly of cow manure. Ex. Z' is rust colored, fine textured and rather mushy, and does not smell of manure.

(3) No evidence of a chemical analysis of Ex. Z' was introduced except with respect to the presence of complaint chemicals.

I conclude from the foregoing that at the time of the commencement of the trial, throughout the trial and at the time that plaintiffs' motion for a new trial was filed, plaintiffs' counsel knew that there was no available competent evidence tending to establish the disposal of complaint chemicals by the defendant itself, either at the tannery site or on the 15 acres.

### (c) Further consideration of Ex. Z' and related materials

During the course of the hearings of January–March, 1989, plaintiffs' counsel learned that some three cubic yards of material similar to Ex. Z' had been found near test well #3 on the 15 acres, that most of it had been removed by tannery employees but that some of it remained on the site. Counsel and an associate then went to the 15 acres and scooped up two more samples of rust colored material which they submitted to a chemist for analysis. I permitted the chemist to testify, notwithstanding the looseness of this procedure, accepting counsel's representations in lieu of the usual testimony regarding custody and non-contamination. The samples were not analyzed for non-volatile organics, but were analyzed for volatile organics such as the complaint chemicals. Ex. Z' was found to contain concentrations of the complaint chemicals, *but the two samples of supposedly similar material collected by counsel did not.* All three

samples contained heptanol, a relatively uncommon industrial compound which is not used in the tanning of leather, but is used as a precursor in the formation of alcohols. All three samples contained various acids and unidentified ketones, a class of acetates widely used in industry, but not identified as the ketones used in tanning.

Thereafter at my suggestion the parties caused the non-volatile organic material in these samples to be analyzed. Expert #1 testified for the plaintiffs that the material was animal fat. Expert #2 testified for the defendant that the material was probably a by-product of the manufacture of polyvinyl chloride. As set forth in some detail in my findings of July 7, 1989, Expert #2 was in my opinion more persuasive, and I found accordingly. In my July finding I overlooked the testimony about the presence of heptanol in all three samples, but this evidence tends to support Expert #2.

The matter of Ex. Z' did not rest there, however. In July of 1989 plaintiffs' counsel learned that the new lessees of the tannery site were dismantling the plant. He again went to the site with an associate, and by means of a pipe inserted through a chain link fence surrounding the site extracted a reddish-brown substance from the bottom of one of several four-wheeled canvas pushcarts lined up against the fence. Although plaintiffs' counsel repeatedly referred to this material as "sludge," it clearly was not sludge for the reasons stated above, but it did bear at least superficial resemblance to Ex. Z' and the other two samples. Walter Sorenson, a former tannery employee who had been hired by the new lessee of the site to dismantle the plant, testified that these pushcarts were used to transport hides and pieces of leather around the tannery, and the substance obtained by counsel was detritus which had accumulated over time in the bottom of the carts.

During the October–November, 1989 hearings, as noted above plaintiffs offered the testimony of two more scientists, Experts #3a and #3b, whose testimony I excluded. I permitted plaintiffs to make

an extended offer of proof in the form of a voir dire examination of the experts themselves. Even though they were considerably more dazzling and persuasive than Expert # 1, I persisted in my decision to exclude their testimony for the following reasons:

(1) Both parties had already presented evidence on the issue of the nature of Ex. Z', and I had made a finding on the subject, which under familiar rules precludes further litigation. A party who losses with his first chosen witness can not keep returning to the fray with new witnesses until he finds one who prevails. I am virtually certain that there exists somewhere potential Expert # 4, waiting to testify that the methods used by Experts # 3a and # 3b were improper. At some point there must be closure.

(2) Doubtless a court has the power in a proper case to reopen testimony on issues of fact already decided, notwithstanding the foregoing considerations. In my opinion this is not a case calling for a departure from this salutary rule of repose. Given the state of the evidence as it now appears, even if I accepted the opinions of Experts # 3a and # 3b, and found that Ex. Z' not only was made of animal fat, but was chemically the same as the detritus found in the tannery pushcarts, there would still be no basis for a case of disposal of the complaint chemicals by the defendant. The salient evidence is as follows:

(a) While Ex. Z' contains the complaint chemicals, the other samples of the same material do not.

(b) The detritus contained in the tannery carts does not contain any of the complaint chemicals.

(c) There is no evidence of disposal of the complaint chemicals by the tannery and significant evidence that no such disposal occurred.

(d) There was abundant evidence that third parties were dumping large quanti-

ties of the complaint chemicals indiscriminately on the 15 acres.

In my opinion this evidence in the aggregate virtually compels the conclusion that the saturation of Ex. Z' was the result of indiscriminate dumping by third parties and not the result of disposal of complaint chemicals by the defendant. At the very least, no rational trier of fact could find the contrary to be more probable than otherwise. In the present posture of the case, therefore, the proffered testimony of Experts # 3a and # 3b has become immaterial.

As a result of the foregoing analysis, I conclude that even with all of the post-trial revelations, including the tannery laboratory reports and formulae and the expert testimony, both admitted and proffered, there is still no available competent evidence tending to prove that it is more probable than otherwise that the defendant disposed of the complaint chemicals at either the tannery site or on the 15 acres. While the Report might well have been very helpful to the plaintiffs in establishing the transport of chemicals from the tannery to wells G and H, in the absence of any evidence of disposal of the complaint chemicals at the site, it is no help at all. The finding in the Report of less than one part per billion of one of the complaint chemicals not otherwise associated with the tannery in one of the test wells is not significant according to the testimony of Margaret Hanley, who was the author of the Report, and in these last hearings the plaintiffs have not argued that it was.[2]

#### (d) Conclusion

■ Reaching a conclusion on this branch of the case requires a divination of what the court of appeals had in mind in establishing its rule of substantial interference, generally delineated as follows:

Under a substantial interference rule as we envision it, a party still need not prove that the concealed material would

---

**2.** There was evidence of complaint chemicals in the waste water from the tannery. This water was drawn initially from Riley well # 2, however, which was conceded to have been contaminated by the heavy concentrations of complaint chemicals on the 15 acres and by the Aberjona River itself, which was similarly polluted from other sources upstream. This evidence is not probative of disposal at the site.

likely have turned the tide at trial. Substantial impairment may exist for example, if a party shows that the concealment precluded inquiry into a plausible theory of liability, denied it access to evidence that well could have been probative on an important issue, or closed off a potentially fruitful avenue of direct or cross examination. [Citations] 862 F.2d at 925.

Neither the Report nor the other concealed material which surfaced during the recent hearings would have turned the tide at trial, in view of the dearth of evidence of disposal. I am at a loss to see how this material could have led in any way to development of evidence of disposal of the complaint chemicals, even though it clearly would have significance if such evidence had otherwise been available. In view of what I now know of plaintiffs' pretrial investigation, the possibility that soil testing of the tannery site would have proved fruitful seems remote. (Certainly plaintiffs' counsel showed no enthusiasm for the opportunity offered in the summer of 1989.) Accordingly, notwithstanding my uncertainty concerning the intent of the court of appeals, I conclude that concealment of the Report and other material did not constitute substantial interference with the preparation of a tannery case, where the essential predicate of such a case—use and disposal of the complaint chemicals by the defendant—was significantly negated by the evidence developed by the plaintiffs themselves in the course of pretrial investigation and discovery, and has never been otherwise established.

Whether or not I have correctly applied the standards specified by the court of appeals in arriving at the foregoing conclusion, it would appear that my duty to recommend whether the plaintiffs are entitled to any remedy, specifically the vacation of the judgment and a new trial in whole or in part, is a separate and discrete obligation. I have no uncertainty on this point. The chance that a viable "tannery case" could be developed in any further proceedings is virtually nonexistent, even if the plaintiffs were entitled to try. In my opinion, a new trial on the issue of the pollution of wells G

and H resulting from disposal of the complaint chemicals at the tannery site would be pointless, wasteful and unwarranted. I respectfully recommend that the court of appeals should not order a new trial with respect to disposal of the complaint chemicals by the defendant either at the tannery site or on the 15 acres.

### 2. The 15 Acres Case

While the court of appeals clearly remanded.this matter specifically for consideration of the impact of concealment of the Report on a potential "tannery case" and indicated that exploration of the 15 acres case was foreclosed by the trial findings, plaintiffs nevertheless insist that Professor Sykes' testimony requires retrial of the 15 acres case. With respect to the 15 acres, the plaintiffs had evidence that the soil and ground water were heavily polluted by the complaint chemicals, that dumping by others of toxic materials on the 15 acres was known to the defendant, that harm to people in the plaintiffs' position was reasonably foreseeable and, through the testimony of Dr. Pinder, that the complaint chemicals were transported by ground water flow from the 15 acres to wells G and H. The evidence of foreseeability was very questionable, but I resolved this close call in favor of the plaintiffs. Accordingly I ruled that this evidence was legally sufficient to be submitted to the trier of fact.

When, after the jury had made a finding of fact for the defendant, I became a finder of fact under Rule 49 with respect to the transport of pollutants by ground water flow, I found as a fact that transport of the complaint chemicals had not been proven by a preponderance of the evidence. I rejected Dr. Pinder's opinion because he did not account for water missing from the Aberjona River and because evidence of the gradients opposite the 15 acres did not support his conclusions.

Professor Sykes' opinion does not in my view cast any cloud upon the correctness of this conclusion, but on the contrary tends to confirm it. He testified that the subsidiary aquifer running under the tannery property would have had relatively little

effect on ground water flow north of Riley well # 2, where most of the pollution was located. More importantly, he testified that Dr. Pinder had been mistaken in his conclusion that the river bed was impermeable and that the river did not substantially contribute to the water pumped by wells G and H. According to Professor Sykes, over half of the water pumped by wells G and H was water from the Aberjona River, which was known to be heavily contaminated by industrial waste, including the complaint chemicals. He further contradicted Pinder by identifying the river as a "charge boundary" impeding the flow of ground water from west to east. Professor Sykes also confirmed Dr. Guswa's testimony that the wells were supplied with contaminated water from the north by the heavy southward flow on the east side of the river. This testimony strongly confirms the factual conclusion which I made under Rule 49(a). The evidence does not establish the probability that the complaint chemicals in the wells came from the 15 acres.

No matter how heartbreaking were the plaintiffs' losses, nor how wrongful the conduct of the powerful defendant corporation, the law requires proof of an efficient causal connection between the conduct and the loss to establish liability. In the absence of such proof, the plaintiffs could not prevail.

Accordingly, I find that concealment of the Report did not substantially impair preparation of the 15 acres case and that the case was correctly decided. I respectfully recommend that no new trial be granted with respect thereto.

## RECOMMENDATIONS WITH RESPECT TO SANCTIONS

■ The plaintiffs have moved for a default judgment and assessment of damages as a sanction for the concealment of the

Report and other documents, and for what they assert has been the perfidy of the lawyers associated with the defense. This would indeed be an extraordinary remedy in view of the fact that plaintiffs have still to prove, among other things, that the concentration of complaint chemicals in the water delivered to the plaintiffs was likely to have been the efficient cause of their many grievous losses. Sanctions generally are intended to deter unacceptable conduct, not compensate the opposing party. *Thomas v. Capital Security*, 836 F.2d 866 (5th Cir.1988). See *Pavelic & LeFlore v. Marvel Entertainment Group, et al.*, — U.S. ——, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989). One of the sanctions available under Fed.R.Civ.P. 37 for failure to provide discovery is the prohibition of the introduction of evidence relating to the object of the discovery by the delinquent party. This sanction is ordinarily applied before trial, and it is difficult to envision its retroactive application after the case has been tried.

The discovery process is at the heart of federal trial practice, however, and deliberate interference with it is a matter ordinarily deserving of a significant sanction if an appropriate sanction could be devised.

The problem in this case, however, is that the honors for sanctionable conduct are about evenly divided. Plaintiffs were entitled to persevere in the prosecution of any claims for which there was an objective basis in fact and law. Plaintiffs implicitly and explicitly represented at trial and through these extensive post-trial proceedings that there was a basis in fact for the assertion that the defendant disposed of the complaint chemicals at the tannery site or on the 15 acres. At least by the close of his investigation and discovery, however, plaintiffs' counsel knew that there was no such basis in fact. Continued prosecution of the claim at that point was a violation both of Fed.R.Civ.P. 11 [3] and 28 U.S.C. sec.

---

**3.** Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated. A party who is not represented by an attorney shall sign the party's pleading, motion, or other paper and state the party's address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two wit-

1927.[4] *Greenberg v. Hilton International Co.*, 870 F.2d 926 (2d Cir.1989); *Thomas v. Capital Security, supra.*[5] It may well be that counsel was genuinely motivated by an earnest desire to serve his clients, who indeed have suffered grievous losses, but fomenting expectations without a factual basis does not serve the clients' best interest anymore than it serves the judicial process.

In the convoluted context of this case, it is my recommendation that neither party should profit through sanctions from the delinquency of the other, and that should be the sanction for both of them.

## SUMMARY

It is my recommendation that all pending motions be denied.

## APPENDIX A

## PROCEDURAL ORDER

### July 14, 1989

In my view the question of whether the interference with plaintiffs' discovery was "substantial" will likely be most economically and effectively resolved by the following procedure. In order to be reliable, however, this procedure must be carried out with absolutely no publicity and maximum possible security to avoid interference with the process by possible well-intentioned but misguided third parties. The

parties agreed to the secrecy of the procedure as outlined in the transcript of a conference with counsel held today. One copy of this transcript may be made available to each party, but it shall not be duplicated or otherwise distributed in any way, nor shall it otherwise be made public until further order of the court.

It would be possible to resolve the issue of substantial interference by taking testimony as to what who would have done when if they had only known what they now know and what effect it might have had on the conduct of the case. Past experience with this case suggests that any such hearing may be protracted and ultimately unsatisfactory.

What is really at the heart of the issue of substantial interference, as defined by the court of appeals, is the factual issue of whether there is any significant amount of the complaint chemicals in the soil or ground water of the tannery property.

In accordance with the discussion with counsel held today the court will appoint its own pair of experts, one to take an agreed number of soil and ground water samples at points on the tannery property designated by the plaintiffs, and a second to analyze the samples. The cost shall be borne by the defendant as a partial sanction under Fed.R.Civ.P. 37(d) for having caused all this trouble. The experts shall be the court's experts under Fed.R.Evidence 614,

---

nesses or of one witness sustained by corroborating circumstances is abolished. The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an

appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

4. Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case as to increase costs unreasonably and vexatiously may be required by the court to satisfy personally such excess costs. June 25, 1948, c. 646, 62 Stat. 957.

5. More latitude should be allowed at the beginning of a case for a claim based on information and belief, but so far as appears plaintiffs did not have even the benefit of rumor, whisper, or even an anonymous tip. The entire exercise was apparently purely for forensic advantage.

however, and shall report directly to the court. The parties shall have the right to cross-examine the experts as provided in the rule.

The experts shall be chosen in the following manner. Each party shall submit to the court the names of three experts of each type by July 24, 1989, at 10 a.m., together with material establishing the competence and independence of each. I will then select the experts who appear to be the most competent and unbiased. I reserve the right to reject them all and require a new submission. I am not likely to be very enthusiastic about experts who have previously worked for the parties in this litigation.

This procedure requires a fair level of cooperation between the parties. Any breach of security before the samples are taken will have the result that positive findings may not be deemed reliable.

If the testing shows the existence of significant amounts of complaint chemicals in the tannery soil or ground water it is likely that I would rule the interference with the plaintiffs' discovery to be substantial, and the reverse if the testing is negative. If the test results are ambiguous, of course, further hearings will be required.

The parties reserve the right to move for expansion of the scope of these hearings, to appeal any rulings of mine based upon the results of the testing above described and to seek additional relief from the court of appeals. Participation in the testing procedure will not operate as a waiver of any of the rights of the parties.

APPENDIX B

ORDER APPOINTING EXPERTS
UNDER FEDERAL RULES OF
EVIDENCE 614

July 25, 1989

Pursuant to the order of July 14, 1989, counsel for the parties met with the court on July 24, 1989 to consider the appointment of experts to test the soil and groundwater of the tannery property. Despite his apparent oral agreement on July 14 with the plan suggested by me, plaintiffs' counsel has concluded that he should not participate in the selection of a court-appointed expert, for reasons noted in a written objection and amplified on the transcript of the conference. The most significant of them is the requirement which I imposed of secrecy, which plaintiffs' counsel correctly argues impinges on his duty to his clients. There are twenty-eight plaintiffs, however, which complicates this issue of security. In my opinion, the limited impingement which I have imposed is justifiable to insure the integrity of any test which is carried out for the reasons stated in my order of July 14, 1989. The plaintiffs accordingly decided to propose their own experts. The defendant proposed the names of three experts to test the soil and groundwater and from EPA certified laboratories to analyze the samples. Since the plaintiffs had elected not to submit candidates, I offered plaintiffs' counsel the option of making the selection from the list submitted by the defendant. He declined.

Accordingly, after review of the qualifications and availability of the nominees submitted by the defendant, I appoint Richard T. Dewling, chairman and chief executive officer of Metcalf & Eddy Technologies, Inc. to take appropriate samples of the soil and groundwater of the tannery property. I appoint York Laboratories, 200 Monroe Turnpike, Monroe, Connecticut to be the laboratory to analyze the samples taken by Mr. Dewling. Mr. Dewling and York Laboratories shall be the court's experts under Federal Rules of Evidence 614. They shall be subject to cross-examination by the parties as provided in the rule.

Their charge will be to make as fair and comprehensive a test of the soil and groundwater as is necessary to determine the presence in the soil and groundwater of any of the chlorinated hydrocarbons which are the subject of this case and which were not disclosed to the plaintiffs in the course of discovery. Mr. Dewling shall have access to all reports of prior tests of the tannery property, and counsel for both parties may meet with him together to specify with reasonable particularity what areas are to be tested. Mr. Dewling shall also do

whatever else may in his judgment be necessary to provide a comprehensive report, including the sampling of waste materials in containers. Counsel for both parties may be present during every stage of the sampling process and shall have a full opportunity to observe the actual operation.

Mr. Dewling must personally supervise the taking of samples and their transportation to the York Laboratories and be prepared to testify as to the integrity of the testing procedure.

Upon completion of the sampling procedure, all requirements of secrecy shall be lifted and all hitherto impounded orders and transcripts shall be released and available to the public and the press. In the meantime, however, this order, the responses of the parties and the transcript of the conference of July 24 shall be impounded, available only to counsel for the plaintiffs, counsel for the defendant, and Mr. O'Sullivan, who has now appeared for Mr. Riley and his corporations.

Following completion of the report I will schedule the hearing directed by the court of appeals, the nature and scope of which will be determined in part by the contents of the experts' reports.

In my view, the result of the sampling and testing of the tannery property will be a significant consideration in the resolution of the issue of substantiality of interference. Accordingly, I deem the foregoing procedure to be the first step in the "orderly presentation" mandated by the court of appeals.

## APPENDIX C

### ORDER ON VARIOUS MOTIONS

September 8, 1989

A. *Motion To Disqualify Defense Counsel*

Plaintiffs have moved to disqualify Hale & Dorr as counsel for the defense. The purported reasons for doing so are an al-

leged conflict of interest and the law firm's failure to obey the orders of the court. Plaintiffs rely on *Kevlik v. Goldstein*, 724 F.2d 844 (1st Cir.1984). That case holds that a party has standing to raise a conflict of interest involving another party, and the district court has broad discretion to disqualify counsel in an appropriate case. In the *Kevlik* case, an attorney for a defendant had previously represented another plaintiff named Southmayd, and had received a confidential communication from Southmayd which might reasonably be assumed to bear on Kevlik's position as well as Southmayd's. The court of appeals affirmed the district court's order of disqualification.[1]

There is nothing even remotely resembling the *Kevlik* case in the present record. Plaintiffs' argument is that counsel will not be forthright about the defendant's alleged defaults in order to protect the firm of Hale & Dorr. I have not observed any tendency on the part of Messrs. Facher and Jacobs to protect themselves improperly. Both have voluntarily taken the stand in the misconduct hearings and submitted themselves to cross-examination. Plaintiffs' counsel declined to cross-examine Attorney Facher.

Plaintiffs attack defense counsel for failure to obey the court's orders with respect to supplementation of answers to interrogatories and in the submission of nominees for court-appointed expert. It is my opinion that plaintiffs' asservations reflect an exaggerated view of opposing counsel's obligations.

A few salient facts should be kept in mind:

1. The tannery has not been owned by the defendant since 1983 and it has no control over the property.

2. While the property is owned in effect by John J. Riley, who may have some continuing obligations even now under the repurchase agreement with Beatrice, the property is in the possession of les-

---

**1.** The court also noted a *caveat:* "We are aware that disqualification motions can be tactical in nature, designed to harass opposing counsel, and have, therefore, kept in mind that 'the pur-

pose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons,'" 724 F.2d at 848.

sees who have no obligation whatsoever and over whom the defendant has no control.

3. The trial in this case terminated in August, 1986 with a decision for the defendant, which remained unchallenged for over a year. There was no obligation on the part of anyone to preserve the property unchanged, and those in possession had the right to make whatever changes were deemed desirable in the course of their business.

4. The court has ruled that the repurchase agreement imposed upon defense counsel the obligation to make reasonable inquiry of Riley and his employees through their attorney. Neither this court not the court of appeals imposed upon counsel the obligation to conduct field investigations.

5. The fact that a building had been built on part of the tannery, and that the tannery had closed was well known to all parties by January, 1989. The plaintiffs should have expected that the manufacturing property would be liquidated in the ordinary course of business. Defense counsel were not obliged to monitor and report on every stage of the operation.

6. The selection of Metcalf & Eddy as court-appointed expert was proper in all the circumstances. Plaintiffs were given the opportunity to nominate three experts; failing that they were given the opportunity to select from the three nominees proffered by the defendant. They defaulted on both opportunities. Hale & Dorr represented that Metcalf & Eddy had no connection with the parties. As far as I know, this was a true representation by Hale & Dorr made after reasonable inquiry. It turns out that one of several thousand Metcalf & Eddy employees was a former employee of Yankee Engineering. This was not known to Hale & Dorr and could only have been discovered by a check of the personnel files of Metcalf & Eddy. The obligation to submit the names of impartial experts did not include the obligation to do such a check of its employees.

For the foregoing reasons, I am satisfied that Hale & Dorr has performed its obligation to the court and made the reasonable inquiries required. There is absolutely no reason for the court to interfere in the defendant's choice of counsel.

B. *Motion To Compel Further Discovery*

For the reasons stated above this motion is denied.

C. *Defendant's Motion For Reconsideration of Discharge of Court–Appointed Expert*

This motion is denied, but not for the reasons stated in plaintiffs' opposition. Mr. Dewling, the chief executive officer of Metcalf & Eddy, should have revealed Mr. Hagger's previous connection with Yankee as a matter of form, but I am satisfied that Hagger's present association with Metcalf & Eddy does not impeach Mr. Dewling's credentials as an independent expert. There is no evidence that Yankee Engineering was engaged in any collusion with the defendant or Riley or that Hagger has any conceivable present interest in this litigation. The incendiary rhetoric in plaintiffs' opposition is unjustified, and the statement that on September 1, 1989 I disqualified Dr. Dewling is not true.

My reason for vacating the order appointing the court's expert is that it now appears that the comprehensive investigation which I intended cannot be completed for another two and one-half months, and will cost nearly half a million dollars. When the order was entered in July, I expected that I would have a report by now. Under the present schedule, I would not be in a position to report to the court of appeals until the first of next year. This is hardly the expeditious completion of the inquiry mandated by the court of appeals.

I agree with the defendant that completion of the study would greatly facilitate the rational termination of the present inquiry. If a new trial were to be ordered this study would save the plaintiffs considerable time and expense, since the cost of

the court-appointed expert was to be borne entirely by the defendant as a sanction for the misconduct described in my memorandum of July 7, 1989. If both parties assented, I would still consider pursuing the investigation. Surprisingly, however, the plaintiffs declined to participate in the selection of an expert, complain about the expert who was selected and now oppose any continuation, notwithstanding their prior insistence that they wanted to learn the truth about the tannery. So be it.

In the absence of the assent of the parties I feel obliged to proceed expeditiously as directed by the court of appeals. I must also reject the defendant's suggestion that a less than comprehensive testing might be accomplished in less time. If the examination were to be less than comprehensive, it would be of no value in the present posture of the case.

*Summary*

Plaintiffs' motion to disqualify Hale & Dorr, plaintiffs' motion to compel further discovery, and defendant's motion for reconsideration of the order discharging the court-appointed expert are all DENIED.

The clerk shall forthwith assign a time for a conference to schedule the next stage of these proceedings as mandated by the court of appeals.

APPENDIX D

MEMORANDUM ON MOTIONS OF JOHN J. RILEY ET AL. AND ATTORNEY MARY RYAN FOR RECONSIDERATION AND MOTION OF ATTORNEY MARY RYAN TO PARTICIPATE IN HEARINGS ON SANCTIONS

December 4, 1989

The above captioned motions were denied by me from the bench on November 15, 1989, with a summary explanation. Since there appears to be some confusion about my reasons for doing so, I restate them in the following exegesis.

John J. Riley and his former attorney, Mary Ryan, have moved for reconsideration of my Findings Pursuant to Remand filed in this case on July 7, 1989. 127 F.R.D. 1. I found, among other things, that Mr. Riley and Ms. Ryan had engaged in "deliberate misconduct" as defined by the court of appeals in *Anderson v. Cryovac*, 862 F.2d 910 (1st Cir.1988) by failing to produce certain reports in response to discovery requests. I did not find that the misconduct of Messrs. Facher and Jacobs, attorneys for the defendant, was "deliberate" as so defined.

My finding of "deliberate misconduct" provided significant advantage to the plaintiffs over the defendant in the next stage of the proceedings. The defendant has not moved for reconsideration. Neither Mr. Riley nor Ms. Ryan are parties to this action and they have no standing to seek relief from any findings or orders which establish the rights of the parties. Both Mr. Riley and Ms. Ryan claim, however, that they are entitled to protect themselves from potential sanctions for "deliberate misconduct." The court's power to impose sanctions for misconduct of the sort involved in this case is derived from Fed.R. Civ.P. 11, 26(g) and 37(d). Sanctions under those rules are to be imposed upon parties and their attorneys. Mr. Riley is not a party and Ms. Ryan is not an attorney for a party. No sanctions can be imposed upon them in these proceedings. Ms. Ryan's attorney expressed concern about disciplinary proceedings in another forum. I do not contemplate instituting any such proceedings. In my view "deliberate misconduct" as used in this case is a term of art with a specialized meaning accorded to it by the court of appeals, and does not necessarily implicate conduct meriting professional discipline.

Ms. Ryan's attorney suggested that Ms. Ryan had some due process right to present testimony vindicating herself and shifting responsibility for "deliberate misconduct" to various attorneys for the defendant, including Messrs. Facher and Jacobs. This argument is totally specious, in my opinion, because Ms. Ryan had not only the opportunity but a positive duty to reveal to the court all of the circumstances surrounding the failure of the defendant

and her client to disclose certain reports at an earlier stage in the case.

Following the remand from the court of appeals I conducted seventeen days of hearings from January through March, 1989, to determine if there had been "deliberate misconduct," and if so, by whom. I specifically ordered Ms. Ryan and Mr. Facher to file comprehensive statements concerning their knowledge of the critical reports, and they both did so. Ms. Ryan was invited to testify, but declined to do so, filing an affidavit in lieu of testimony which substantially replicated her previous statement. Messrs. Facher and Jacobs testified at some length, expanding on the statement previously filed by Mr. Facher. I found the account of their participation in these matters to be credible,[1] and so reported. Ms. Ryan was privy to all of this testimony, and was present in the courtroom for most of it. She made no attempt to contradict Mr. Facher's statement. It was abundantly clear from the tenor of the hearings, as well as from the opinion of the court of appeals, that communications from Riley to the defendant and among their respective lawyers was of critical importance to the determinations ordered by the court of appeals.

Ms. Ryan came forward three months after my findings were filed with an affidavit asserting communications with defendant's attorneys never before revealed, said to be supported by no less than forty-one documents contradicting defendant's attorneys in several respects. No rule of due process that I know of permits an attorney in Ms. Ryan's position, under an order to make a complete statement, to withhold information until such time as it is to her advantage to reveal it, and then to insist that the court retry the whole matter. Such a rule would put a premium on strategic concealment, which is what these proceedings are all about, and violate the policy of repose.

Accordingly, I denied all of the above motions.

---

1. There was a suggestion in the New York Times of December 1 that I made no finding of "deliberate misconduct" with respect to Mr. Facher because (a) he and I attended Harvard Law School together, and (b) he and I are men past the first bloom of youth and Ms. Ryan is a woman "of another era." It is true that Facher and I were at law school "together" in the sense that our time there overlapped, but we were not in the same class, and as far as I know shared no courses. I do not recall any communication with him whatsoever until he tried a case before me in the late seventies. I state categorically that I do not discriminate among attorneys on the basis of age, sex, race, religion or previous law school affiliation.