# United States Court of Appeals

## For the First Circuit

No. 01-1648

JOHN J. RILEY, JR. AND DIANA W. RILEY,

Plaintiffs, Appellants,

v.

JONATHAN HARR; RANDOM HOUSE, INC., NEW YORK; VINTAGE BOOKS;
RANDOM HOUSE AUDIO PUBLISHING, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Boudin, Chief Judge,
Rosenn,* Senior Circuit Judge,
and Lipez, Circuit Judge.

Peter A. Riley for appellants.

Steven M. Gordon, with whom Lucy J. Karl, Shaheen & Gordon,
P.A., and Linda Steinman were on brief, for appellees.

June 11, 2002

* Of the Third Circuit, sitting by designation.

**LIPEZ, Circuit Judge**.  Objecting to his portrayal in Jonathan Harr's best-selling book A Civil Action, an account of toxic tort litigation over contaminated well water in Woburn, Massachusetts, that allegedly caused the death of several children, John J. Riley, Jr., sued Harr and his publisher for defamation and related torts.  He was joined in that lawsuit by his wife, Diane W. Riley.  The district court granted summary judgment for the defendants on most of the Rileys' claims on First Amendment grounds.  The Rileys appeal the district court's disposition of their claims.  We affirm.

## I. Background

We begin with a brief overview of the events described in A Civil Action (the Book) that pertain to this case; the specific statements to which Riley objects are discussed in turn infra, and are also set forth in an appendix to this opinion.[1]  The Book, first published in 1995, was on the New York Times Bestseller List for over two years and has been made into a motion picture.  The Book received much critical acclaim and has been required reading in law school courses.  It purports to be a nonfictional account of a toxic tort lawsuit (the "Anderson litigation") brought by some residents of Woburn, Massachusetts, alleging that defendants Beatrice Foods Company (Beatrice), W.R. Grace & Company (Grace), and others were responsible for the contamination of two municipal water wells (Wells G and H) in the Aberjona River Valley with toxic

---

[1]  For simplicity's sake, we generally denote the plaintiffs collectively as "Riley," and the defendants collectively as "Harr."

solvents, including trichloroethylene (TCE).[2]  The Anderson plaintiffs claimed that contaminated well water had caused them and their children to contract various ailments, including several fatal cases of leukemia, and that some of the TCE found in Wells G and H had come from a tannery operated by Riley (the "tannery"). Beatrice had assumed the tannery's environmental liabilities when it purchased the tannery in 1978.[3]  The plaintiffs' theory was that Riley or his subordinates had dumped TCE on a fifteen acre parcel of undeveloped land between the tannery and the contaminated wells (the "fifteen acres"), and that the TCE had migrated into Wells G and H.

The Book tells the story of the Anderson litigation primarily from the perspective of the plaintiffs' attorney, Jan Schlichtmann, recounting his struggle to prove that Riley's tannery and defendant Grace were responsible for the contamination of Wells G and H.[4]  The Book describes evidence which, in Schlichtmann's view, tended to show that the tannery had dumped waste laced with TCE on the fifteen acres, and repeatedly suggests that Riley's denials that such dumping had occurred were false.  Although

---

[2]  The case was originally captioned Anderson v. Cryovac, C.A. No. 82-1672-S (D. Mass).  For a fuller account of the Anderson litigation, see Anderson v. Cryovac, Inc., 862 F.2d 910 (1st Cir. 1988); and Anderson v. Beatrice Foods Co., 900 F.2d 388 (1st Cir. 1990).

[3]  Until 1978, the Riley family had owned the tannery.  Riley continued to operate the tannery after Beatrice purchased it, and resumed ownership of it in 1983.

[4]  Grace had operated a manufacturing facility in the vicinity of Wells G and H.

Schlichtmann is the Book's protagonist, and granted Harr extensive access to his law firm during the litigation, Harr's account of his efforts is by no means uncritical. As Schlichtmann builds his case, Harr points out both its strengths and its weaknesses. Harr also conducted extensive interviews with attorneys for the Anderson defendants, and the Book recounts the grounds for their rejection of Schlichtmann's theories. The Book also notes Schlichtmann's failure to find direct proof of dumping by the tannery, Riley's steadfast denials of Schlichtmann's allegations, the conflicting views of experts on each side of the case, and the 1986 jury verdict in federal district court which rejected the plaintiffs' claims against the tannery.[5]

After the trial was over, Schlichtmann discovered a report which Yankee Environmental Engineering and Research Services, Inc. (Yankee) had completed for Riley in 1983. The report stated that tannery waste had been dumped on a hillside leading to the fifteen acres, and that groundwater under the tannery flowed toward Wells G and H. Schlichtmann moved to set aside the verdict on the basis of this newly discovered evidence, which he argued should have been produced during discovery, and tracked down new witnesses who described the removal from the fifteen acres of what Schlichtmann believed to have been tannery waste. The district court conducted a hearing and found that Riley had engaged in "concealment" of the Yankee report that was

---

[5] The plaintiffs subsequently settled their claims against defendant Grace.

"deliberate," a determination which the Book reports as follows: "The judge found that Riley had committed perjury and that [his attorney] was guilty of 'deliberate misconduct' in failing to give Schlichtmann the Yankee report." The court concluded, however, that a new trial was not warranted because "there was no available competent evidence tending to establish the disposal of complaint chemicals by the defendant . . . either at the tannery site or on the 15 acres." Anderson v. Beatrice Foods Co., 129 F.R.D. 394, 400 (D. Mass. 1989).[6]

Riley took exception to a number of statements about him in the Book. In 1998 he commenced this action against Harr and his publishers, Random House, Inc. and Vintage Books (a division of Random House), in New Hampshire Superior Court. Defendants removed the case to federal district court on the basis of diversity of citizenship.[7] Riley's amended complaint challenged twelve statements in the Book in seven counts: (I) intentional infliction of emotional distress; (II) slander (against Harr only); (III) defamation; (IV) invasion of privacy -- public disclosure of private facts; (V) invasion of privacy -- placing the plaintiff in a false light; (VI) loss of consortium; and (VII) a demand for enhanced compensatory damages. Reduced to its essence, Riley's

---

[6] Subsequent Environmental Protection Agency studies concluded that Beatrice's land had contaminated Wells G and H, and Beatrice agreed to pay its share of cleanup costs. A Civil Action at 491.

[7] Riley is a New Hampshire citizen while Harr is a Massachusetts citizen, and the three corporate entities all have their principal place of business in New York. The amount in controversy exceeds $75,000 excluding costs and interest.

action seeks to hold Harr liable for wrongly describing him as a liar (see Statements C, D, E, F, H, I, J, and K infra), a perjurer (see Statement A infra), a "kille[r]" (see Statement G infra), a depressive (see Statement L infra) (or, in the alternative, for disclosing the private fact of his depression), and a bully (see Statement B infra).

The defendants moved to dismiss Riley's complaint, or in the alternative for summary judgment. The district court treated their motion as one for summary judgment, and in a lengthy, thoughtful order dated March 31, 2000, granted the motion with respect to most of Riley's claims. The order denied Harr's motion for summary judgment as to two of the twelve statements, and denied his motion to dismiss Riley's slander claim.[8] Following limited discovery, the parties stipulated on March 26, 2001, to the dismissal of those claims that had survived the district court's order of March 31, 2000. On April 25, 2001, Riley filed a notice of appeal of the district court's order.

---

[8] Riley's slander claim relates to a speech Harr delivered in Newburyport, Massachusetts. The district court indicated that Harr's motion to dismiss for lack of personal jurisdiction was premised on the assumption that the other counts against Harr would also be dismissed. The district court wrote that "[n]either party . . . has addressed the issue of jurisdiction under the circumstances now prevailing: that is, where the court has not dismissed all of the causes of action regarding which Harr has not contested personal jurisdiction" (emphasis added). The court explained that "[u]nder these circumstances, Harr's challenge to personal jurisdiction with respect to [the slander count] implicates the complex and unsettled doctrine of pendent personal jurisdiction." The district court concluded that "[b]ecause the parties have not briefed the issue it would be premature to consider and resolve it at this juncture."

## II. Defamation

We first set out the general principles which guide our inquiry, and then turn to the challenged statements.

## A. General Principles

"[T]he First Amendment to the United States Constitution place[s] limits on the application of the state law of defamation."[9]  Milkovich v. Lorain Journal Co., 497 U.S. 1, 14 (1990).  In the wake of New York Times Co. v. Sullivan, 376 U.S. 254 (1964), the Supreme Court has developed an elaborate body of law that defines those limits.  In the case of a public-figure plaintiff the First Amendment requires clear and convincing proof of actual malice on the part of the defendant.[10]  Gertz v. Robert Welch, Inc., 418 U.S. 323, 342-43 (1974).  A private-figure plaintiff such as Riley need not demonstrate actual malice, but "must bear the burden of showing that the speech at issue is false

---

[9]  In the district court, Riley argued that New Hampshire law governed his claims.  Harr's position was that New York law controlled, but he indicated that the court did not have to decide this issue because "New York and New Hampshire law are functionally equivalent" on the relevant issues.  The district court therefore applied New Hampshire law. See Independent Mechanical Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 118 (1993) (describing New Hampshire defamation law).

[10]  Harr does not argue that Riley is a public figure.

before recovering damages for defamation from a media defendant."[11] Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 777 (1986).

The Supreme Court has also recognized "constitutional limits on the type of speech which may be the subject of state defamation actions." Milkovich, 497 U.S. at 16 (emphasis in original). In Milkovich, a case involving a media defendant, the Court held that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law." 497 U.S. at 19. Milkovich also rejected the proposition that the First Amendment creates a blanket exception to state defamation law for "statements which are categorized as 'opinion' as opposed to 'fact.'"[12] Id. at 17. The Court pointed out that "expressions of 'opinion' may often imply an assertion of objective fact," id. at 18, and "[it] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words, 'I think.'" Id. at 19 (citation and internal quotation marks omitted). As we observed in a subsequent decision, "[a]

---

[11] In place of the common-law presumption that defamatory speech is false, the Supreme Court has established "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages" against a media defendant. Milkovich, 497 U.S. at 16 (quoting Hepps, 475 U.S. at 776).

[12] Some had read Gertz, 418 U.S. at 339-40, to "create a wholesale defamation exception for anything that might be labeled 'opinion.'" Milkovich, 497 U.S. at 18. The Gertz court observed that "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Gertz, 418 U.S. at 339-40.

-8-

statement couched as an opinion that presents or implies the existence of facts which are capable of being proven true or false can be actionable."  Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 127 (1st Cir. 1997).

However, and of central importance in this case, even a provably false statement is not actionable if "'it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts . . . .'"  Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000) (quoting Haynes v. Alfred A. Knopf. Inc., 8 F.3d 1222, 1227 (7th Cir. 1993)).  As the Ninth Circuit has explained, "when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." Partington v. Bugliosi, 56 F.3d 1147, 1156-57 (9th Cir. 1995).

We applied these principles in Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724 (1st Cir. 1992).  The plaintiff, producer of a version of "The Phantom of the Opera" that was not the successful and acclaimed Broadway show created by Andrew Lloyd Webber, sued the Boston Globe for defamation, claiming that certain Globe articles had falsely accused it of endeavoring to pass off its own production as the Broadway version.  Id. at 725.  We held that although the allegation of deliberate deception might be provable as true or false, "[t]he sum effect of the

format, tone and entire content of the articles is to make it unmistakably clear that [the author] was expressing a point of view only," rather than "stating 'actual facts' about [the plaintiff's] honesty."  Id. at 729 (citation omitted).  We explained:

> Of greatest importance . . . is the breadth of [the] articles, which not only discussed all the facts underlying [the author's] views but also gave information from which readers might draw contrary conclusions.  In effect, the articles offered a self-contained give-and-take, a kind of verbal debate . . . .  Because all sides of the issue, as well as the rationale for [the author's] view, were exposed, the assertion of deceit reasonably could be understood only as [the author's] personal conclusion about the information presented . . . .

Id. at 730.

We then distinguished the facts in Milkovich, where the author of a newspaper column charging that a high school wrestling coach had lied about his behavior at a meet informed his readers that he was in "a unique position" to know that the coach had lied because he had personally observed the relevant events.  497 U.S. at 5, n.2.  We wrote:

> the article in Milkovich, unlike [the] "Phantom" columns, was not based on facts accessible to everyone.  Indeed, a reader reasonably could have understood the reporter in Milkovich to be suggesting that he was singularly capable of evaluating the plaintiffs' conduct.  In contrast, neither of [the Globe] columns indicated that [the author], or anyone else, had more information about Phantom Touring's marketing practices than was reported in the articles.  While [the Globe's] readers implicitly were invited to draw their own conclusions from the mixed information provided, the Milkovich readers implicitly were told that only one conclusion was possible.

-10-

Id. at 730-31. See Moldea v. New York Times Co., 22 F.3d 310, 317 (D.C. Cir. 1994) ("Because the reader understands that [the challenged statement] represent[s] the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation.") (citation and internal quotation marks omitted).

In sum, the basic issue before us is whether the challenged statements in A Civil Action implicitly signal to readers "that only one conclusion [about Riley] was possible," and therefore do not qualify as protected opinion under Milkovich and Phantom Touring, or whether "readers implicitly were invited to draw their own conclusions from the mixed information provided," in which case the First Amendment bars Riley's defamation action. Phantom Touring, 953 F.2d at 731. In making this determination, we look not just at the specific statements complained of, but also at "the general tenor of the [Book]" and the context in which the challenged statements are set. Milkovich, 497 U.S. at 21. We are mindful that the subject of A Civil Action -- a controversial lawsuit and the disputed events underlying it -- "is one about which there could easily be a number of varying rational interpretations," and that in writing about such "inherently ambiguous" subjects, an author who "fairly describes the general events involved and offers his personal perspective about some of [the] ambiguities and disputed facts" should not be subject to a defamation action. Partington, 56 F.3d at 1154. Otherwise,

-11-

authors would hesitate to venture beyond "dry, colorless descriptions of facts, bereft of analysis or insight," and the threat of defamation lawsuits would discourage "expressions of opinion by commentators, experts in a field, figures closely involved in a public controversy, or others whose perspectives might be of interest to the public"  Id.

## B. Standard of Review

We have observed that "when defamation issues implicate free speech concerns. . . . appellate judges must conduct a whole-record review and 'examine for themselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment' protect." Levinsky's, 127 F.3d at 127 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964)).  Therefore, "the courts treat the issue of labeling a statement as verifiable fact or as [protected] opinion as one ordinarily decided by judges as a matter of law."  Gray, 221 F.3d at 248, citing Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 510-11 (1984).

## C. The Challenged Statements

To put the challenged statements in context, we follow the district court's helpful practice of quoting some of the text surrounding the specific language cited in Riley's complaint.  The specific language Riley complains of is indicated in bold.  We adopt the letters used by Riley to designate the statements at issue.  We depart somewhat from the usual letter sequencing,

however, to discuss the statements in a more logical order.  We address in turn statements suggesting that Riley is a liar (in the order of our discussion, statements C, E, F, H, J, I, K and D); a perjurer (Statement A); and a killer (Statement G).

### Statement C

Statement C describes Schlichtmann's reaction to the discovery of a document indicating that tannery waste had been deposited on the fifteen acres in 1956:

> This document was thirty years old and it dealt only with tannery waste, which might or might not have contained TCE.  But even so, Schlichtmann thought it had great value. **Riley had sworn at his deposition that he had never dumped anything on the fifteen acres. Riley had lied then**, and Schlichtmann -- who didn't need much convincing -- believed that **Riley was also lying about using TCE.**

The assertion in Statement C that Riley had lied in the course of the Anderson litigation is, in principle, "provable as false." Milkovich, 497 U.S. at 19.  A statement is not actionable, however, if "it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise." Gray, 221 F.3d at 248 (citation and internal quotation marks omitted).

The district court found that Statement C "is clearly written in Schlichtmann's voice," reporting his "inner musings about the evidence he was gathering," and therefore "could not be construed by a reasonable reader as [an] assertion[] of fact." Riley concedes that the assertion about Riley that follows the words "Schlichtmann . . . believed" represents Schlichtmann's view

-13-

of Riley's testimony, but asserts that the phrase "Riley had lied then" constitutes Harr's own factual claim. We agree with the district court that the phrase "Riley had lied then" -- coming almost immediately after and elaborating upon the sentence "But even so, Schlichtmann thought it had great value," and situated in a section of the Book that recounts Schlichtmann's efforts to build a case against the tannery -- is Schlichtmann's conclusion, not Harr's. As Harr points out, "[t]he law does not force writers to clumsily begin each and every sentence with 'Schlichtmann felt'" in order to indicate that a statement is being attributed to Schlichtmann. As Statement C is cast as Schlichtmann's assessment of Riley's testimony, and follows a summary of the evidence upon which it is based (the document reporting the discovery of tannery waste on the fifteen acres), it amounts to "a subjective view, an interpretation, a theory, conjecture, or surmise," not an assertion of objective fact based on undisclosed evidence. Gray, 221 F.3d at 248 (citation and internal quotation marks omitted).

Moreover, even if we accepted Riley's premise that the statement "Riley had lied then" constitutes Harr's own declaration that Riley had uttered a falsehood, the statement would still be protected under the First Amendment. Like the allegedly defamatory newspaper articles in Phantom Touring, the Book "not only discussed . . . the facts underlying [Harr's] views but also gave information from which readers might draw contrary conclusions." Phantom Touring, 953 F.2d at 730. For example, one page before Statement C, Harr writes that "One after another, interviews with

-14-

a dozen former tannery employees led Schlichtmann nowhere. None could recall using TCE, or dumping tannery waste . . . on the fifteen acres." A Civil Action at 186. Immediately after Statement C, the Book reports Schlichtmann's discovery of a witness who seemed at first to offer compelling testimony that tannery waste had been dumped on the fifteen acres, but who (the Book acknowledges) turned out to lack credibility. Id. at 187-91. Later in the Book, Harr again states that "Schlichtmann did not have eyewitnesses who could implicate John J. Riley in the contamination of the fifteen acres." Id. at 298. As we noted at the outset, the Book makes plain both the strengths and the weaknesses of the case against Riley. "Because [both] sides of the issue, as well as the rationale for [Harr's] view, were exposed, the assertion of deceit reasonably could be understood only as [Harr's] personal conclusion about the information presented," not as a statement of objective fact based on undisclosed evidence. Phantom Touring, 953 F.2d at 730.

We reject Riley's claim that Harr's explanatory "To the Reader" and "Note on Sources" sections, detailing his extensive access to Schlichtmann during the Anderson trial and the voluminous research he conducted in writing the Book, signal to the reader that every conclusion the book attributes to Schlichtmann amounts to an assertion by Harr of verifiable, objective fact. Harr's purpose in notifying the reader of his extensive access to Schlichtmann is plainly not to establish that Schlichtmann is an omniscient figure whose inferences are all correct. Rather, his

-15-

point is simply that he was well positioned to tell the story of the <u>Anderson</u> litigation from Schlichtmann's vantage point, and to describe the attorney's subjective experience of the chronicled events.

Statement E

Like Statement C, Statement E appears in the section of the Book which describes Schlichtmann's efforts to build a case against Riley's tannery:

> **It seemed that everyone but Riley recognized the fifteen acres as a toxic waste dump. Riley <u>must</u> have known about the condition of the property. Perhaps, thought Schlichtmann, the tanner really had been running an unauthorized waste dump. Perhaps he had charged his neighbor, Whitney Barrel, a fee for the use of the land.**

As with Statement C, Riley argues that the district court erred in finding that the first two sentences of Statement E were written in Schlichtmann's voice, rather than in Harr's. But the context in which Statement E is set makes clear that it describes Schlichtmann's thinking as he worked to assemble a case against the tannery. Moreover, as with Statement C, Statement E would be non-actionable even if it were deemed to recount Harr's own evaluation of Riley's state of mind, as it is based on evidence -- some pointing in one direction, some in the other -- which the Book describes in substantial detail. <u>Phantom Touring</u>, 953 F.2d at 730.

Riley asserts that <u>Phantom Touring</u> is inapposite because Harr failed to report that some of Schlichtmann's own investigators had concluded that the tannery was not responsible for the

-16-

contamination of the fifteen acres.  Although the Book does not mention this specific fact, it does report evidence (some of which we describe in connection with Statement C supra) tending to negate Schlichtmann's theory of the case.  Harr was not required to report every single fact about the Anderson litigation, but was free to make his own editorial choices, so long as he "fairly describe[d] the general events involved."  Partington, 56 F.3d at 1154.

Statement F

Statement F refers to a substance which Schlichtmann's investigators discovered on the fifteen acres having the characteristics of tannery waste and containing TCE:

> **If this material was indeed tannery waste, then how had it become contaminated with TCE, which Riley claimed he had never used?  It was, of course, possible that someone else -- Whitney, perhaps -- had dumped TCE on top of it.  That was possible, but to Schlichtmann the most logical explanation was that it had all come from the same place.  And if that was true, it meant that Riley had lied about TCE.**

Riley acknowledges that Statement F recounts Schlichtmann's thinking, but asserts that the passage is defamatory because Harr "failed to disclose to the reader that TCE simply wasn't used by the Riley Tannery."  We reject Riley's contention that Harr was required to include in the Book a declaration that the tannery had not used TCE.  The Book reports Riley's repeated denials of TCE use, and notes Schlichtmann's failure to discover conclusive evidence to the contrary.  Having set out the evidence for the reader to weigh, Harr cannot be subject to defamation

liability for failing to endorse Riley's version of events. Partington, 56 F.3d at 1154.

Riley is simply wrong to assert that the Book fails to disclose the facts upon which Statement F is based, and that Statement F implies the existence of undisclosed facts. On the contrary, Harr reports in great detail the factual basis for Schlichtmann's conclusion, including facts that create problems for Schlichtmann's theory of the case.

Statements H and J

Statement H reports a comment Schlichtmann made in reaction to Riley's performance on the witness stand:

> "Riley surprised me today," [Schlichtmann's partner Conway] said. "He came off looking better than he should have. He was so arrogant and combative in his deposition."
> **"He's a liar but he's not stupid," said Schlichtmann.**

Statement J recounts Schlichtmann's reaction to Riley's testimony:

> **When Riley had sat on the witness stand, [Schlichtmann had] wanted to turn to the jurors and say, "See? This man is lying now."**

As we have explained, Harr was entitled to report Schlichtmann's opinion that Riley had given false testimony, having disclosed the facts upon which the opinion was based, including some facts that are in tension with Schlichtmann's conclusion. Phantom Touring, 953 F.2d at 730.

## Statement I

Statement I is Schlichtmann's account of what he believed was a successful moment in his examination of Riley:

> "It was great, wasn't it, Charlie!  Why would Riley immediately make the connection between TCE and destroying records?  **Because he was covering up!**  The jury understood that, didn't they?"

Riley had testified earlier about the destruction of records indicating what chemicals the tannery had used.  Returning to the subject at the end of his examination, Schlichtmann inquired: "Mr. Riley, when did you destroy those records?"  Harr writes:

> The tanner was instantly enraged.  The question worked just as Schlichtmann had hoped.  In a loud, angry voice, Riley said, "I don't know when those records were destroyed, but I will repeat to you, sir, again and again, we never used trichloroethylene--"
>
> "No, no, no," interrupted the judge. "You're not being asked that.  You're being asked when the records were destroyed.  You say you don't know.  Next question, Mr. Schlichtmann."
>
> "That's all," said Schlichtmann smiling.

Statement I is Schlichtmann's reaction to Riley's outburst.  As we have explained, the factual basis for the opinion that Riley was "covering up" is laid out in the Book, as are certain facts tending to discredit it.  We agree with the district court that "a reasonable reader would fully understand that the statement does not convey that Schlichtmann knew as a fact that Riley was covering up, but merely that [in Schlichtmann's opinion] that 'had to be' the reason for his non-responsive answer."

-19-

<u>Statement K</u>

Statement K reports Schlichtmann's excited reaction, in the post-trial phase of the Book, to his discovery of a witness who had seen soil, which Schlichtmann surmised contained contaminated tannery waste, being removed from the fifteen acres:

> Back in the car, Schlichtmann told [his law partner], **"We've opened the box and the worms are starting to crawl out. This isn't just hiding evidence, this is destroying evidence."**

Riley contends that Statement K "is actionable as verifiable fact known to be false to the publisher," because "Judge Skinner clearly ruled that any removal activities were . . . legitimately connected to . . . EPA well monitoring operations and were performed in full view of EPA personnel."

We reject Riley's untenable premise that Judge Skinner's ruling precludes commentators outside of the judicial system from expressing a contrary view. Moreover, Harr does report that Judge Skinner "found that the 'removal activity' on the fifteen acres 'was legitimately connected to the drilling of test wells and other investigative procedures.'" <u>A Civil Action</u> at 484.

Perhaps sensing the force of Harr's argument that the Book does report views contrary to those Riley deems defamatory, Riley asserts that Harr failed to "fully and concomitantly" reveal to the reader that Judge Skinner later ruled that Schlichtmann's surmise that tannery workers had been "destroying evidence" was incorrect. Harr is right to observe that the implication of this argument would be that "an author cannot write a book describing in

-20-

chronological order an attorney's efforts to try a case," but instead "must reveal the end result of every legal hunch immediately." A Civil Action is meant to be read as a whole; we decline to impose on authors the nonsensical requirement that all points of view be set forth at the same time.

### Statement D

In his quest for evidence that Riley's tannery had contaminated the fifteen acres with TCE, Schlichtmann's private investigator interviewed Ruth Turner (a pseudonym), an elderly woman who lived near the tannery:

> Her husband, Paul [who had died in 1981], would often walk down behind the house, in the forest by the Aberjona River, on the land owned by Riley. He would return from his walks and tell her about the barrels and piles of debris he'd seen there, and how sludge waste from the tannery would flow down the hill and onto the land. In the years before Paul's death in 1981, recalled Ruth, he often awoke in the middle of the night. On several occasions, he'd told Ruth about hearing the sounds of trucks at two or three o'clock in the morning. He had said that he could see the headlights of flatbed trucks full of barrels driving up the access dirt road onto the fifteen acres. **"They're dumping stuff in the middle of the night," Ruth recalled his saying**.

Riley contends that a reader "could understand the passage as stating that Riley did, in fact, dump illegal material on the 15 acres." However, the Book makes clear that despite his suspicions, Schlichtmann never succeeded in proving that Riley was responsible for illegal dumping. Read in context, Statement D describes a piece of evidence which suggested to Schlichtmann that the tannery

-21-

had contaminated the 15 acres with TCE, but did not prove that it had done so. It is this unmistakable theme of the Book -- Schlichtmann's inability to move from theory, conjecture, and surmise to actual proof -- which Riley's complaint somehow overlooks. See Gray, 221 F.3d at 248 (citation and internal quotation marks omitted).

Statement A

After the Anderson trial was over, Schlichtmann discovered that Riley, during the pendency of the Anderson litigation, had commissioned Yankee to conduct a hydrogeologic investigation of the tannery property. Yankee had written a report describing its findings, which was never produced for the plaintiffs during discovery. Nor was a subsequent report reevaluating Yankee's data. Judge Skinner ruled that Riley had engaged in deliberate concealment of the reports. The judge explained:

> In his testimony on deposition and at trial Riley denied the existence of these reports. With respect to each question, taken separately, the answer might be justified because of hypertechnical interpretations of the questions posed by the interrogator. (For instance, "Did you test the sludge?" Answer[:] "No." Fact: He caused a test to be made by someone else.) Similarly one could quibble over the definition of the documents. There were enough such questions, however, so that any fair response should at one time or another have revealed the existence of these reports. In addition, Mr. Riley denied the existence of laboratory reports and chemical formulas which were clearly called for. Even allowing for Mr. Riley's apparent unsophistication and inarticulateness, I conclude that the pattern of evasive answers concerning these reports and the other

-22-

documents by Mr. Riley requires a finding that the concealment was deliberate.

Anderson v. Beatrice Foods Co., 127 F.R.D. 1, 5 (D. Mass. 1989).

Statement A is Harr's description of Judge Skinner's finding:

**The judge found that Riley had committed perjury and that Mary Ryan was guilty of 'deliberate misconduct' in failing to give Schlichtmann the Yankee report**.

Riley contends that "deliberate concealment" does not amount to the crime of perjury, and that Statement A is therefore a false account of the judge's ruling.

The Supreme Court has observed that "[t]he common law of libel . . . overlooks minor inaccuracies and concentrates upon substantial truth. . . . Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516-17 (1991) (citation and internal quotation marks omitted). As the district court noted, under New Hampshire law "[a] statement is not actionable if it is substantially true." Simpkins v. Snow, 139 N.H. 735, 740 (1995).

Moreover, under the fair report privilege, "'the publication of defamatory matter concerning another in a report of an official . . . proceeding . . . that deals with a matter of public concern [is privileged] if the report is accurate and complete or a fair abridgement of the occurrence reported.'" Hayes v. Newspapers of New Hampshire, Inc., 141 N.H. 464, 466 (1996) (quoting Restatement (Second) of Torts § 611 (1977)). A "fair"

-23-

report need not be a verbatim report; it is enough that the report be "a rough-and-ready summary that is substantially correct." Id. at 466 (citation and internal quotation marks omitted); see also Lambert v. Providence Journal Co., 508 F.2d 656, 659 (1st Cir. 1975) (noting courts' "reluctance to entertain libel suits dependent upon a precise construction of a newspaper's use of technical legal terminology"); Ricci v. Venture Magazine, Inc., 574 F. Supp. 1563, 1567 (D. Mass. 1983) ("a journalist's report need not describe legal proceedings in technically precise language" if it meets "a common sense standard of expected lay interpretation").

Judge Skinner found that Riley's denial of the existence of the Yankee report under oath amounted to deliberate concealment. We agree with the district court that the word "perjury" -- defined in the Random House Webster's Unabridged Dictionary (2d ed. 1997) as "the willful giving of false testimony under oath" -- is a fair rendition of Judge Skinner's characterization of Riley's conduct, and is therefore non-actionable under New Hampshire law. Although Judge Skinner did not say that Riley's actions met the legal definition of perjury, Harr's account is "a rough-and-ready summary" of the judge's ruling that is "substantially correct." Hayes, 141 N.H. at 466.

Riley argues that because the Book was published six years after Judge Skinner made his "deliberate misconduct" pronouncement, Harr "had ample time to review the official record and accurately report the Court's findings." Riley declares that the non-contemporaneous nature of Harr's report somehow "result[s]

-24-

in the attenuation of the need for and purpose of the fair report privilege and 'rough and ready' protection analysis." In a closer case we might deem a six year gap between the event reported and the publication of the report a factor to be weighed in evaluating the report's fairness. This is not a close case, however, and Riley offers no reason why we should reject the usual rule that "a journalist's [substantially accurate] report need not describe legal proceedings in technically precise language" simply because Harr had enough time, in principle, to master the precise legal meaning of the term "perjury." Ricci, 574 F. Supp. at 1567.

### Statement G

After Riley's first day on the witness stand, Schlichtmann's colleagues critiqued his examination of Riley. The Book reports that Tom Neville suggested to Schlichtmann that "'[t]he jury wants you to kick the shit out of [Riley]." After Thomas Kiley had exhorted Schlichtmann to "crack" Riley, the following ensued:

> Neville jumped up, too, and hovered over Schlichtmann from the other side. "You've got to manhandle him!" said Neville.
> "Yeah, great," said Schlichtmann, his head bowed, his voice soft. "That's good showmanship, but I've got to get evidence in."
> **"My God, this is the guy who killed your kids!" yelled Neville.** "You should be attacking him with a fucking baseball bat! You shouldn't be asking him" -- Neville adopted a mincing tone -- "And then what did you do next, Mr. Riley?" . . . .
> [Schlichtmann's colleagues continue to coach him. The scene concludes with Kiley saying to Schlichtmann:] "In my eleven years of trial experience, you've got more shit to use on this guy than I've ever seen before.

-25-

You can fucking destroy him.  What does it
take to get you mad?"

Riley argues that Statement G would be understood by a reasonable reader as a statement of provable fact.  Harr responds that Statement G is a hyperbolic expression that cannot be understood as an assertion of objective fact.

Reading Statement G in context, it is unmistakable that Neville's purpose in describing Riley as "the guy who killed your kids" is to inspire Schlichtmann to conduct a more forceful examination of Riley, and that Harr's purpose in reporting this episode is to capture the reaction of Schlichtmann's colleagues to his poor performance that day.  In a sense, Statement G is "rhetorical hyperbole, a vigorous epithet" used by Neville to arouse Schlichtmann's fighting spirit.  Milkovich, 497 U.S. at 17 (quoting Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6, 13-14 (1970)).  "[T]he First Amendment protects the 'rhetorical hyperbole' and 'imaginative expression' that enlivens writers' prose."  Partington, 56 F.3d at 1157 (quoting Milkovich, 497 U.S. at 20).

However, in contrast to Greenbelt, where the court concluded that the defendant's use of the word "blackmail" was not meant as a literal accusation that the plaintiff had committed the crime of blackmail, the Anderson plaintiffs did contend that Riley's tannery, by causing TCE to enter the Woburn water supply, had "killed" their children.  Greenbelt, 398 U.S. at 14; see also Letter Carriers v. Austin, 418 U.S. 264, 285 (1974) (description of

-26-

plaintiff as a "traitor" was not a literal accusation that plaintiff had committed the crime of treason). Even so, Statement G is non-actionable for the same reasons that the statements discussed supra, charging Riley with giving false testimony, are non-actionable. Having disclosed the facts upon which Statement G is based, Harr is entitled to report Neville's view that Riley's actions had caused the death of the plaintiffs' children. Phantom Touring, 953 F.2d at 730.

## III. False Light

In opposition to the district court's entry of summary judgment for Harr on his false light invasion of privacy claims in connection with Statements A, C, D, E, F, G, H, I, J and K, Riley simply refers us to his arguments against the dismissal of his defamation claims. We agree with the district court that it is unnecessary to decide whether the New Hampshire Supreme Court would recognize the false light tort because Riley's false light claim is "a mere restatement of [his] defamation claim, but under a different name." Harr is therefore entitled to the same constitutional protections that compelled the district court to dismiss his defamation claims. See Brown v. Hearst Corp., 54 F.3d 21, 27 (1st Cir. 1995) (holding that where a false light claim is "simply a restatement of [a] defamation claim under a different heading[,] . . . it is not imaginable that it could escape the same constitutional constraint as [the] defamation claim").

## IV. Public Disclosure of Private Fact

Statement L describes Riley's appearance at the post-trial hearing on the failure of the defendants to produce certain documents:

> Riley returned to the courtroom in early March, three years after first taking the witness stand during trial. Back then, he'd been aggressive and antagonistic, but now he looked sickly, moody, and listless. He paced in the corridor, eyes narrowed and suspicious, mouth tightly compressed. **He was in his mid-sixties, suffering from episodes of depression.**

Although the district court denied Harr's motion for summary judgment on Riley's <u>defamation</u> claim as to Statement L, deeming it to be a non-protected assertion of the verifiable fact that Riley had experienced episodes of depression, it granted summary judgment on Riley's public disclosure of private fact claim on the ground that his depression was substantially relevant to the <u>Anderson</u> litigation, a matter of legitimate public concern.[13] In assessing Riley's public disclosure of private fact claim, we must assume that Statement L is <u>true</u> (otherwise it would not amount to the disclosure of a private "fact.")

The district court concluded that the New Hampshire Supreme Court would recognize, if it had not already done so by implication, a cause of action for public disclosure of private fact. <u>See</u> <u>Hamberger</u> v. <u>Eastman</u>, 106 N.H. 107, 111 (1964)

---

[13] Riley has since abandoned his defamation claim as to Statement L in order to get a final judgment.

(declaring that "'a person who unreasonably and seriously interferes with another's interest in not having his affairs known to others . . . is liable to the other'") (quoting Restatement of Torts § 867). However, the district court declared that the First Amendment "protects the publication of private facts that are newsworthy, that is, of legitimate concern to the public. Even if the private fact is not itself newsworthy, its publication is still protected if it has substantial relevance to, or any substantial nexus with a newsworthy topic" (citations and internal quotation marks omitted).

Riley does not challenge the district court's premise that Statement L is non-actionable if it is substantially relevant to the story told in the Book. He argues instead that the court erred in finding the fact of his depression to be relevant to the Anderson litigation. Assuming with the district court that New Hampshire would recognize a cause of action for public disclosure of private fact, and that this cause of action contemplates an exception for statements that are substantially relevant to a matter of legitimate public concern, we evaluate the relevance of Riley's depression to the story recounted in the Book.

The relevance of Statement L to the subject matter of the Book is unmistakable. The Book reports that Beatrice's attorney, concerned about Riley's performance on the witness stand during the post-trial hearing, "would have liked to bring out the fact of Riley's depression in defense of the tanner's mental confusion and failures of memory, but Riley had told him, 'I don't want to talk

-29-

about that.'" <u>A Civil Action</u> at 482. We also agree with Harr that one of the purposes of the Book was to chronicle "the devastating emotional toll of the litigation on many of the participants," including Riley and Schlichtmann, the Book's protagonist. Under these circumstances, Riley's mental condition was relevant to the <u>Anderson</u> litigation.

**V. Intentional Infliction of Emotional Distress**

The district court dismissed Riley's intentional infliction of emotional distress claim on the ground that "New Hampshire law does not recognize a cause of action for wrongful infliction of emotional distress where the factual predicate sounds in defamation" (quoting <u>DeMeo</u> v. <u>Goodall</u>, 640 F. Supp. 1115, 1116 (D.N.H. 1986). We do not reach this question of New Hampshire law, however, because we are convinced that Riley's allegations, as a matter of law, do not rise to the level of "'extreme and outrageous conduct'" required to support an intentional infliction of emotional distress action. <u>Morancy</u> v. <u>Morancy</u>, 593 A.2d 1158, 1159 (N.H. 1991) (quoting <u>Restatement (Second) of Torts</u> § 46). Conduct is deemed to be extreme and outrageous "only where [it] has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Miller</u> v. <u>CBC Cos., Inc.</u>, 908 F. Supp. 1054, 1067 (D.N.H. 1995) (quoting <u>Restatement (Second) of Torts</u> § 46, comment d). Such cannot be said of Statements A, C, D, E, F, G, H, I, J, and K, which express in various ways the view that Riley had not given truthful

-30-

testimony during the Anderson litigation (see supra). Although we realize that Riley would have preferred that Harr not publish a critical evaluation of his testimony in the Anderson case, we are also persuaded that Harr's portrayal of Riley cannot be said to have exceeded "all possible bounds of decency," or to be "atrocious, and utterly intolerable in a civilized community."

We take the same view of Statement L (see supra), which reports that Riley had experienced "episodes of depression" (relevant to the Anderson litigation), and also of Statement B. [14] Statement B reads:

> **He had once confronted a neighbor who had written an article about the tannery stench for the Civic Association Newsletter. Banging on the neighbor's door one evening, he had stomped uninvited into the living room, put his thick finger to his neighbor's chest and yelled that he, Riley, was a big taxpayer in the city, and by what right did the neighbor slander his business in such a manner? The neighbor, at first taken aback by the verbal tirade, finally told Riley to get out of his house.**

Although perhaps unflattering, Harr's publication of this account of Riley's conduct simply does not rise to the level of "atrocious" or "utterly intolerable" conduct.

---

[14] The district court denied Harr's motion to dismiss Riley's defamation claim with respect to Statement B, declining to rule as a matter of law that the statement was not defamatory. The parties subsequently stipulated to the dismissal of Riley's defamation claim with respect to Statement B.

## VI. Loss of Consortium and Enhanced Compensatory Damages

At the end of their brief, the Rileys assert that their claims for loss of consortium and enhanced compensatory damages should go forward "[f]or all of the reasons set forth above in sections I-IV of this Brief [dealing with the Rileys' defamation and other tort claims]."[15] This is the extent of their argument on the loss of consortium and enhanced compensatory damages claims. In Sections II-V of this opinion, we rejected the Rileys' arguments as to their defamation and other tort claims on which the district court properly granted summary judgment for Harr. The same arguments advanced in support of their loss of consortium and enhanced compensatory damages claims necessarily must fail for the same reasons.

**Affirmed.**

---

[15] Punitive damages are not available in New Hampshire, but "when the act involved is wanton, malicious, or oppressive, the compensatory damages awarded may reflect the aggravating circumstances." Panas v. Harakis, 529 A.2d 976, 986 (N.H. 1987) (citation omitted).

The specific language Riley complains of is indicated in bold.  We have included some of the surrounding text to help put the challenged statements in context.  Citations are to the 1996 Vintage Books edition.  The letters assigned to the statements reflect the lettering used by Riley during the litigation.

A .  **The judge found that Riley had committed perjury and that Mary Ryan was guilty of 'deliberate misconduct' in failing to give Schlichtmann the Yankee report.**  A Civil Action at 483.

B.  **He had once confronted a neighbor who had written an article about the tannery stench for the Civic Association Newsletter.  Banging on the neighbor's door one evening, he had stomped uninvited into the living room, put his thick finger to his neighbor's chest and yelled that he, Riley, was a big taxpayer in the city, and by what right did the neighbor slander his business in such a manner?  The neighbor, at first taken aback by the verbal tirade, finally told Riley to get out of his house.**  A Civil Action at 91-92.

C.  This document was thirty years old and it dealt only with tannery waste, which might or might not have contained TCE.  But even so, Schlichtmann thought it had great value.  **Riley had sworn at his deposition that he had never dumped anything on the fifteen acres.  Riley had lied then, and Schlichtmann -- who didn't need much convincing -- believed that Riley was also lying about using TCE.**  A Civil Action at 187.

D.  Her husband, Paul [who had died in 1981], would often walk down behind the house, in the forest by the Aberjona River, on the land owned by Riley.  He would return from his walks and tell her about the barrels and piles of debris he'd seen there, and how sludge waste from the tannery would flow down the hill and onto the land.  In the years before

Paul's death in 1981, recalled Ruth, he often awoke in the middle of the night. On several occasions, he'd told Ruth about hearing the sounds of trucks at two or three o'clock in the morning. He had said that he could see the headlights of flatbed trucks full of barrels driving up the access dirt road onto the fifteen acres. **"They're dumping stuff in the middle of the night," Ruth recalled his saying.** A Civil Action at 188.

E. **It seemed that everyone but Riley recognized the fifteen acres as a toxic waste dump. Riley must have known about the condition of the property. Perhaps, thought Schlichtmann, the tanner really had been running an unauthorized waste dump. Perhaps he had charged his neighbor, Whitney Barrel, a fee for the use of the land.** A Civil Action at 191-92.

F. **If this material was indeed tannery waste, then how had it become contaminated with TCE, which Riley claimed he had never used? It was, of course, possible that someone else -- Whitney, perhaps -- had dumped TCE on top of it. That was possible, but to Schlichtmann the most logical explanation was that it had all come from the same place. And if that was true, it meant that Riley had lied about TCE.** A Civil Action at 193.

G. "Yeah, great," said Schlichtmann, his head bowed, his voice soft. "That's good showmanship, but I've got to get evidence in." **"My God, this is the guy who killed your kids!" yelled Neville.** "You should be attacking him with a fucking baseball bat! You shouldn't be asking him" -- Neville adopted a mincing tone -- "And then what did you do next, Mr. Riley?" . . . .
[Schlichtmann's colleagues continue to coach him. The scene concludes with Kiley saying to Schlichtmann:] "In my eleven years of trial experience, you've got more shit to use on this guy than I've ever seen before.

You can fucking destroy him. What does it take to get you mad?" <u>A Civil Action</u> at 311.

H. "Riley surprised me today," [Schlichtmann's partner Conway] said. "He came off looking better than he should have. He was so arrogant and combative in his deposition."
   **"He's a liar but he's not stupid," said Schlichtmann.** <u>A Civil Action</u> at 312.

I. "It was great, wasn't it, Charlie! Why would Riley immediately make the connection between TCE and destroying records? **Because he was covering up!** The jury understood that, didn't they?" <u>A Civil Action</u>, p. 315.

J. **When Riley had sat on the witness stand, [Schlichtmann had] wanted to turn to the jurors and say, "See? This man is lying now."** <u>A Civil Action</u> at 371.

K. Back in the car, Schlichtmann told [his law partner], **"We've opened the box and the worms are starting to crawl out. This isn't just hiding evidence, this is destroying evidence."** <u>A Civil Action</u> at 470.

L. Riley returned to the courtroom in early March, three years after first taking the witness stand during trial. Back then, he'd been aggressive and antagonistic, but now he looked sickly, moody, and listless. He paced in the corridor, eyes narrowed and suspicious, mouth tightly compressed. **He was in his mid-sixties, suffering from episodes of depression.** <u>A Civil Action</u> at 480.