Muse, J.
Joseph Bonome (“Bonome”) filed this action alleging invasion of privacy under G.L.c. 214, §1B against Susana Kaysen (“Kaysen”), the author of a memoir at the center of this case, and Random House, Inc. (“Random House”), the publisher. The defendants now move to dismiss the complaint pursuant to Mass.R.Civ.P. 12(b)(6).[2] For the reasons that follow, the defendants’ motion to dismiss is ALLOWED.
Background
For purposes of this motion, this court will consider the factual allegations contained in the complaint as well as the memoir at issue in this case entitled, The Camera My Mother Gave Me (the “book”). This court will accept as true all factual allegations and “indulge every reasonable inference hospitable to [the plaintiffs] case.” Schaer v. Brandeis Univ., 432 Mass. 474, 477-78 (2000) (citations omitted). Bonome’s complaint arises out of passages from the book which relate details of Bonome’s intimate relationship with Kaysen.
1. The Relationship
In the early 1990s, Bonome owned and operated a tree surgery and landscaping business primarily in the Cambridge, Massachusetts area. At the time, he was living in New Hampshire and was married with stepchildren. Kaysen was an author living in Cambridge. She had gained success and notoriety for her book Girl, Interrupted which was made into what has been described to be a critically acclaimed film! In 1994, Bonome met Kaysen and the two began having an affair, including a physical relationship. Kaysen pressured Bonome to leave his wife, and Bonome ultimately succumbed to that pressure. Bonome divorced his wife in 1996 and shortly thereafter moved into Kaysen’s home, where they continued the relationship.
Within six months or a year into the relationship, Kaysen began to experience severe vaginal pain. She began to regularly see doctors for her problem, but over the course of several years was unable to receive sufficient curative treatment. During this time period, she began working on a new book, which book is the subject of this case. Despite Bonome’s inquiries, Kaysen would not reveal the subject of the book to him.[3]
The fact of their relationship was well-known to Bonome’s family, friends, and clientele. However, the details of their physical relationship were private. Bonome’s parents and three brothers all spent time, including some holidays, with the couple. However, in July 1998, the relationship “ended” when Kaysen asked Bonome to move out, which he did. Despite the breakup, their physical relationship continued for at least three months longer.
2. The Book
In 2001, Random House published the book. The book only refers to Bonome as Kaysen’s “boyfriend” *696 and alters details about his life — such as where he was from, and his occupation. The book is an autobiographical memoir chronicling the effects of Kaysen’s seemingly undiagnosable vaginal pain in a series of ruminations about the condition’s effects on many aspects of her life, including her overall physical and emotional state, friendships, and her relationship with her boyfriend. It details her intense pain and discomfort and her many fruitless attempts to obtain an accurate medical diagnosis and effective treatment.
One of the central themes of the book concerns the impact of her chronic pain on the emotional and physical relationship with Kaysen’s boyfriend. To that end, the book details, graphically on a few occasions, several sexual encounters between them. It portrays the boyfriend as becoming increasingly frustrated and impatient with Kaysen’s condition and her reluctance and/or refusal to engage in physical intimacy. The boyfriend is described as “always bugging [her] for sex” and “whining and pleading” for sex, as well as being ignorant and insensitive to her emotional and physical state. In this vein, it attributes many aggressive and overtly offensive sexual quotes to him. Ultimately, the development of this theme culminates in a scene where the boyfriend is physically forceful in an attempt to engage her in sex. This scene is followed by ruminations about whether the relationship had exceeded the bounds of consensual sexual relations into the realm of coerced non-consensual sex.
For a short time I indulged myself in this idea. He was trying to rape me. But he wasn’t really, was he? I’d been more than willing five minutes earlier. That was the point though. That was why I felt he was trying to rape me. Because he hadn’t seen how willing I was. All he could see was what he wanted.
After publication of the book, Bonome learned that many local friends and family had read the book and understood the portrayal of the “boyfriend” to be a depiction of him. In addition, Bonome’s business clientele included friends of Kaysen who also understood that Bonome was the “boyfriend.” As a result of the publication, Bonome has suffered severe personal humiliation, and his reputation has been severely damaged among a substantial percentage of his clients and acquaintances.
Discussion
1. Standard
Under Mass.R.Civ.P. 12(b)(6), a motion to dismiss will be allowed if the plaintiff has failed to state a claim upon which relief can be granted. Mass.R.Civ.P. 12(b)(6); Shaer, 432 Mass, at 477-78. In deciding this motion, the court will consider the complaint as well as the book, The Camera My Mother Gave Me. All factual allegations will be taken as true, and all reasonable inferences arising therefrom will be taken in a light favorable to the plaintiff. Id. Whether the book’s publication could constitute a violation of G.L.c. 214, §1B is a question of law for this court. Jones v. Taibbi, 400 Mass. 786, 801 (1987) (whether published information was matter of “legitimate public concern” is a question of law for the court); Peckham v. Boston Herald, Inc., 48 Mass.App.Ct. 282, 288 (1999) (“we reject the view that the legitimacy of public concern should always be treated as a question of fact, as that view eschews the well-recognized gatekeeper function of the judiciary in these cases ... It is the role of the court to determine whether a jury question is presented”); Cefalu v. Boston Globe, Inc., 8 Mass.App.Ct. 71, 74 (1979) (pretrial judgment especially appropriate where “the stake here ... is free debate . . . The threat of being put to the defense of a law suit. . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself’) (citation omitted).
2. The Right to Privacy
General Laws chapter 214 Section IB provides that: “[a] person shall have a right against unreasonable, substantial or serious interference with his privacy.” Section IB has been interpreted to include the common-law tort of “public disclosure of private facts” as articulated in the Restatement (Second) of Torts. See Bratt v. Int’l Bus. Mach. Corp., 392 Mass. 508, 518 (1984); Peckham, 48 Mass.App.Ct. at 284-90, citing Restatement (Second) of Torts §652D (1977). This statutory right is circumscribed by important constitutional rights — namely, the First Amendment right to free speech. Peckham 48 Mass.App.Ct. at 286, citing, inter alia, The Florida Star v. B.J.F., 491 U.S. 524, 533 (1989); Smith v. Daily Mail Publishing Co., 443 U.S. 97, 103 (1979); Cox Broad Corp. v. Cohn, 420 U.S. 469, 492 (1975). Translated into more concrete terms, the right to control publication of one’s private affairs is tempered by the constitutionally protected right of others to publish matters of “legitimate public concern.” Id;[4] The Boston Herald, Inc. v. Sharpe, 432 Mass. 593, 612 (2000) (“When the subject matter . . . is of legitimate public concern . .. there is no invasion of privacy”), citing Restatement (Second) of Torts §652D comment d (1977). The first court in the United States to recognize the right of privacy acknowledged precisely these limits.
The right of privacy is unquestionably limited by the right to speak and print. It may be said that to give liberty of speech and of the press such wide scope as has been indicated would impose a very serious limitation upon the right of privacy; but if it does, it is due to the fact that the law considers that the welfare of the public is better subserved by maintaining the liberty of speech and of the press than by allowing an individual to assert his right to privacy in such a way as to interfere with the free expression of one’s sentiments and the publication of every matter in which the public may be legitimately interested.
Pavesich v. New England Life Ins. Co., 50 S.E. 68, 74 (Ga. 1905).
*697 Defining “an unreasonable, substantial, or serious” invasion of privacy, thus, requires the court to engage in the difficult task of drawing the line between inviolable private information and matters of legitimate public concern. This inquiry often involves, as it does here, balancing important, legitimate, and countervailing interests.[5] Moreover, it is not merely balancing the individual’s privacy interest against the public’s interest in disclosure. The public, as evidenced by the enactment of G.L.c. 214, §1B, has an equally important interest in safeguarding the individual’s right to keep private aspects of his life private. See G.L.c. 214, §1B; Pavesich 50 S.E. at 73 (“Publicity in many cases is absolutely essential to the welfare of the public. Privacy in other matters is not only essential to the welfare of the individual, but also to the well-being of society.”).
Furthermore, this statute codifies what some consider a more basic right to control the flow of information about oneself. E.g., Diane L. Zimmerman, Requiem for a Heavyweight: A Farewell to Warren and Brandeis’s Privacy Tort, 68 Cornell L.Rev. 291, 293 (1983) (describing this right to privacy as “the right to govern authoritatively both the nature of personal information exposed to public view and the conditions under which others may discuss those personal facts” and the “legal power to control the flow of information about one’s self to other people”); Pound, Interests of Personality, 28 Harv.L.Rev. 343, 363 (1915); Warren & Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193, 214-16 (1890). See also Peckham, 48 Mass.App.Ct. at 286. Thus, the statute, which protects one’s right to keep private facts private, implicitly recognizes the more obvious concomitant personal right to disclose one’s “private” information as he sees fit. Pavesich 50 S.E. at 70-71 (recognizing that the “right of privacy” and the correlative right “to exhibit oneself to the public” are part and parcel of the same fundamental personal liberty). In this light, this case presents an additional challenge in that it pits Kayseris right of publicity — her own right to disclose intimate facts about herself — directly in conflict Bonome’s right to control the dissemination of private information about himself.[6]
2. Bonome’s Privacy Interest
Undoubtedly, the information revealed was of an intensely intimate and personal nature. Indeed, commentators and courts have almost universally recognized one’s sexual affairs as falling squarely within the sphere of private life. E.g. Peckham 48 Mass.App.Ct. at 282-88 (quoting the Restatement); Prosser, Privacy, 48 Cal.L.Rev. 383, 422-23 (1960); Restatement (Second) Torts §652D, comment b (“Sexual relations, for example, are normally entirely private matters”). Moreover, the light in which Bonome is portrayed would be highly offensive to a reasonable person. Indeed, the ruminations in the book depict Bonome engaging in sexual activity and being emotionally unavailable and insensitive to Kayseris condition. They culminate with the suggestion that he raped her. These subjects lay at the core of the most intimate and highly personal sphere of one’s life. Accordingly, Bonome has a legitimate and legally cognizable interest in protecting “an unreasonable, substantial, or serious” disclosure of those details.
3. The Defendants’ First Amendment Rights
As noted above, the First Amendment to the United States Constitution protects the defendants’ rights to publish truthful information which is the subject of “legitimate public concern.” Peckham 48 Mass.App.Ct. at 286-89; Riley v. Harr, 292 F.3d 282, 298-99 (1st Cir. 2002). See Cox Broadcasting Corp., 420 U.S. at 492. Thus, the issue is whether the highly intimate details of both Kayseris and Bonome’s lives are matters of “legitimate public concern.”
Courts have broadly defined the scope of matters of legitimate public concern. As the Appeals Court stated in Peckham
Although the boundaries of “legitimate public concern” have not been comprehensively explored in the Massachusetts case law, the Restatement (Second) of Torts provides the following relevant discussion in comments g and h to §652D, at 390-91.
Included within the scope of legitimate public concern are matters of the kind customarily regarded as “news.” To a considerable extent, in accordance with the mores of the community, the publishers and broadcasters have themselves defined the term, as a glance at any morning paper will confirm. Authorized publicity includes publications concerning homicide and other crimes, arrests, police raids, suicides, marriages and divorces, accidents, fires, catastrophes of nature, a death from the use of narcotics, a rare disease, the birth of a child to a twelve-year-old girl, the reappearance of one supposed to have been murdered years ago, a report to the police concerning the escape of a wild animal and many other similar matters of genuine, even if more or less deplorable, popular appeal.
In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern.
48 Mass.App.Ct. at 287-88. Comment j to Section 652D states further that:
*698 The scope of a matter of legitimate concern to the public is not limited to “news,” in the sense of reports of current events or activities. It extends also to the use of names, likenesses, or facts in giving information to the public for purposes of education, amusement or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published.
Similarly, the United States Supreme Court stated that:
the risk of . . . exposure [of the individual to the public] is a necessary incident of life in a society which places a primary value on freedom of speech and of press. Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.
Time, Inc. v. Hill, 385 U.S. 374, 388 (1967).
Thus, otherwise private information may properly be published when it is sufficiently related to a broader topic of legitimate public concern. Id.[7] In this case, a critical issue is whether the personal information concerning Bonome is in the book for its relevance to issues of legitimate public concern or is merely “morbid and sensational plying into [Bonome’s] private [life] for its own sake.”
In light of the constitutional implications, courts have been generous to publishers in determining that private information relates to issues of legitimate public concern. For example, in Peckham, the Appeals Court held that the personal details of a prominent businessman’s extramarital affair were related to the several broader “topics that are issues of general modern public interest — workplace liaison between an employee and her superior, the subsequent disavowal of paternity and layoff of the employee, and the possibility that a mother would be forced to seek public assistance because the putative father refused to give support.” 48 Mass.App.Ct. at 289. The concern was cogently articulated by a federal district court in Dresbach v. Doubleday & Co, Inc.
[W]e tread on dangerous ground deciding exactly what matters are sufficiently relevant to a subject of legitimate public interest to be privileged. First Amendment values could obviously be threatened by the uncertainly such decisions could create for writers and publishers. “Only in cases of flagrant breach of privacy which has not been waived or obvious exploitation of public curiosity where no legitimate public interest exists should a court substitute its judgment for that of the publisher.
518 F.Sup. 1285, 1290-91 (D.D.C. 1981) (citation omitted).
After examining the statements concerning the boyfriend and their relevance to the broader themes of the book, it is clear that the details are included to develop and explore those themes. Specifically, the book explores the way in which Kaysen’s undiagnosed physical condition impacted her physical and emotional relationship with “her boyfriend.” Moreover, it explores the issue of when undesired physical intimacy crosses the line into non-consensual sexual relations in the context of her condition. These broader topics are all matters of legitimate public concern, and it is within this specific context that the explicit and highly personal details of the relationship are discussed. Thus, the defendants had a legitimate and protected interest to publish these facts.
As noted above, there is an additional interest in this case: Kaysen’s right to disclose her own intimate affairs. In this case, it is critical that Kaysen was not a disinterested third party telling Bonome’s personal story in order to develop the themes in her book. Rather, she is telling her own personal story— which inextricably involves Bonome in an intimate way. In this regard, several courts have held that where an autobiographical account related to a matter of legitimate public interest reveals private information concerning a third party, the disclosure is protected so long as there is a sufficient nexus between those private details and the issue of public concern. Id.; Anonsen, 857 S.W.2d at 705-06; Campbell v. Seabury Press, 614 F.2d 395, 397 (5th Cir. 1980).
Where one’s own personal story involves issues of legitimate public concern, it is often difficult, if not impossible, to separate one’s intimate and personal experiences from the people with whom those experiences are shared. Thus, it is within the context of Bonome and Kaysen’s lives being inextricably bound together by their intimate relationship that the disclosures in this case must be viewed. Because the First Amendment protects Kaysen’s ability to contribute her own personal experiences to the public discourse on important and legitimate issues of public concern, disclosing Bonome’s involvement in those experiences is a necessary incident thereto. Anonsen, 857 S.W.2d at 705-06; Campbell, 614 F.2d at 397.
4. The Degree of the Book’s Interference with Bonome’s Privacy
As the above-cited cases recognize, the privilege to disclose private information is limited by the requirement that the disclosure bear the necessary nexus (both logical and proportional) to the issue of legitimate public concern. In this regard, it is of importance that Kaysen did not use Bonome’s name in the book. The defendants did not subject Bonome to unnecessary publicity or attention. The realm of people that could identify Bonome as the boyfriend are those close personal friends, family, and business clients that knew of the relationship. This is not to overlook or discount the impact this dis *699 closure may have had on Bonome, or his substantial claim that Kaysen breached a fundamental trust of their relationship. However arguably odious, the defendants did not exercise the right of disclosure in a manner offensive to the balance of those interests. See Restatement (Second) Torts §652D, comment a (“Publicity... means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge”).
5. Conclusion
This court is not unmindful of the injury claimed by Bonome, who alleges to have suffered personal humiliation within his familial circle, as well as with friends and business clientele as a result of the book’s publication. Nonetheless, Kaysen’s own personal story — insofar as it relates to matters of legitimate public concern — is hers to contribute to the public discourse. This right is protected by the First Amendment. Inasmuch as the book does not exceed the bounds of that constitutional privilege, Bonome’s claim for invasion of privacy under G.L.c. 214, §1B is DISMISSED.
Order
For the reasons stated above, it is hereby Ordered that counts I, II, & III are DISMISSED.

At the hearing, Plaintiffs counsel agreed to dismiss counts I & II. Therefore, counts II & III are hereby DISMISSED.

Bonome’s allegation that Kaysen engaged him in the relationship so that she would have a “boyfriend” to use in the book are baseless and patently contradicted by the undisputed facts and allegations in the record.

The United States Supreme Court has never decided the issue whether the First Amendment absolutely protects one’s right to publish truthful information. However, in 1979 the Court noted that: “Our recent decisions demonstrate that state action to punish the publication of truthful information seldom can satisfy constitutional standards.” Smith v. Daily Mail Publishing Co., 443 U.S. 97, 102 (1979). Some courts have interpreted Cox Broad Corp. as upholding the constitutional legitimacy of this cause of action. See Anonsen v. Donahue, 857 S.W.2d 700, 702 (Tex.App., 1993).

The Pavesich court foretold precisely this difficulty. 50 S.E. at 72 (“It may be said that to establish a liberty of privacy would involve in numerous cases the perplexing question to determine where this liberty ended and the rights of others and of the public began ... It may be that there will arise many cases which lie near the border line which marks the right of privacy on the one hand and the right of another individual or of the public on the other”).

The Texas Court of Appeals framed this issue as “whether a person’s right to make public the most private details of their own life is limited when the information also reveals painful intimacies of other persons.” Anonsen, 857 S.W.2d at 701.

Nobles v. Cartwright, 659 N.E.2d 1064, 1076 (Ind.App., 1995) (“when dealing with the disclosure of such allegedly ‘private’ fact about a plaintiff, courts generally require an appropriate nexus or some sufficient degree of relatedness between the fact or information disclosed and a matter which was . . . of legitimate public interest”).